**IN RE: Daniel L. JUNK and Christine H. Junk, Debtors.**

**Case No. 13–55139**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

April 19, 2017

James A Coutinho, J Matthew Fisher, Allen, Kuehnle Stovall & Neuman LLP, Susan L Rhiel, Levinson LLP, Columbus, OH, Kristin Radwanick, Centerville, OH, for Debtor.

Myron N Terlecky Columbus, OH, for Trustee

## OPINION AND ORDER ON AMENDED MOTION OF CHAPTER 7 TRUSTEE FOR AN ORDER (1) AUTHORIZING AND APPROVING THE COMPROMISE OF CLAIMS WITH CITIMORTGAGE, INC., ITS AFFILIATES, PREDECESSORS OR SUCCESSORS IN INTEREST, (2) AUTHORIZING AND APPROVING THE TRANSFER OF REAL ESTATE LOCATED AT 181 OLDFIELD WAY, BLUFFTON, SOUTH CAROLINA AND LOT 50 ADJACENT THERETO TO CITIMORTGAGE, INC., AND (3) ENJOINING THE DEBTORS FROM VIOLATING THE TERMS OF THE COMPROMISE AND SALE (DOC. 207)

John E. Hoffman, Jr., United States Bankruptcy Judge

### I. Introduction

Myron N. Terlecky ("Terlecky"), the Chapter 7 trustee of the bankruptcy estates of Daniel L. Junk and Christine H. Junk (the "Junks"), seeks authority to sell estate property to CitiMortgage, Inc. ("CitiMortgage"), to settle any claims the estates have against CitiMortgage, and to enjoin the Junks from taking any actions based on those claims. Terlecky also re-

quests relief from the 14–day stay of any order approving the proposed sale. For the reasons stated below, the Court approves the sale and compromise and enjoins the Junks from taking any actions based on the claims being settled, but declines to grant relief from the 14–day stay.

## II. Background

The Junks make several arguments in opposition to Terlecky's settlement with CitiMortgage, including an argument challenging the Court's authority to approve the settlement. To provide context for those arguments, some background is in order.

In 2005, the Junks purchased residential real estate located in South Carolina (the "Real Estate") and financed more than $800,000 of the purchase price by borrowing money from, and executing a promissory note and mortgage in favor of, American Home Mortgage. That same year, they borrowed approximately $200,000 more from a different lender in order to make improvements to the Real Estate. Then, in late 2006, the Junks refinanced the loans they took out the year before by executing a $1.2 million note (the "Note") and a mortgage (the "Mortgage") in favor of American Home Mortgage. *See Junk v. CitiMortgage (In re Junk)*, 512 B.R. 584, 589–90 (Bankr. S.D. Ohio 2014) (the "Stay Relief and Abstention Order").

In 2009, the Junks stopped making payments on the Note and took several steps designed to remove the Mortgage from the Real Estate and eliminate their obligation under the Note without making all the payments due under it. For instance, in March 2009, they sent CitiMortgage a notice purporting to rescind the Note and the Mortgage. *See id.* at 589, 592. In addition, in April 2009, "[Daniel] Junk—asserting that he was an agent of American Home Mortgage—signed and filed a document with the [county] recorder stating that it was a satisfaction of mortgage and that the

Mortgage was released and satisfied in full." *Id.* at 592. He filed the satisfaction of mortgage even though he knew that the Junks had not come close to paying the full amount due under the Note. *See id.* Indeed, at that point, the Junks had made payments on the 30–year Note for just a little over two years.

As a result of the events described above, several years of litigation ensued in South Carolina between the Junks and CitiMortgage (as well as numerous other parties sued by the Junks) in the Beaufort County Court of Common Pleas (the "State Court"). The history of that litigation is set forth in detail in the Stay Relief and Abstention Order, *id.* at 592–602, but suffice it to say here that things did not go as the Junks had hoped. For example, Daniel Junk told the State Court that "I've never got [the 2005] note[s] back" and "[s]o I don't know if they paid off" the owner of the 2005 notes. *Id.* at 595. Hearing that argument, the State Court expressed considerable skepticism, noting that no entity had tried to collect on the 2005 notes and pointing out that the 2005 mortgage had been satisfied of record. *Id.* at 595–96.

In addition to expressing views contrary to the legal positions taken by the Junks in the case, the State Court issued one ruling after another against them. *See id.* at 596–602. For example, the State Court dismissed the claim they had brought against CitiMortgage for rescission of the Note and the Mortgage under the Truth in Lending Act ("TILA"). The State Court dismissed the Junks' rescission claim *with prejudice* for two reasons:

(1) that the [Junks] had failed to state a claim for relief because they had "failed to plead or otherwise allege in the counterclaims that they possessed the ability to tender the loan proceeds as required to maintain a TILA rescission counter-

claim" but instead were "seek[ing] to avoid their mortgage obligation altogether while keeping the house[;]" and (2) the [Junks] did not exercise the right, if any, to rescind in a timely fashion.

*Id.* at 601. As discussed in more detail in connection with the Junks' opposition to Terlecky's request for approval of the settlement with CitiMortgage, the Junks rely heavily on the rescission claim even though the State Court has already dismissed it with prejudice.

The State Court also dismissed with prejudice claims asserted by the Junks against CitiMortgage for fraud, negligent misrepresentation, breach of contract, civil conspiracy, and slander of title. In fact, the State Court dismissed with prejudice each of the claims they asserted against CitiMortgage, so all that would remain for the State Court to decide absent the settlement would be CitiMortgage's claims in its foreclosure case against the Junks and their defenses to the enforceability of the Note and the Mortgage in that case. *See id.*

The Junks moved to Ohio while the State Court case and their appeals from the State Court's decisions remained pending. *See id.* at 597. Then, after litigating unsuccessfully in South Carolina for nearly two more years, they commenced a Chapter 11 case in this Court. CitiMortgage filed proof of claim number 6–3 ("Claim 6–3") in the bankruptcy case, asserting a secured claim in the amount of $1,495,088.84. Attachments to the proof of claim include a copy of the complaint filed in the State Court (the "State Court Complaint"). The State Court Complaint identifies the plaintiff as Bayview Loan Servicing, LLC ("Bayview"). But also attached to Claim 6–3 are copies of two other documents—an Assignment of Mortgage from Bayview to CitiMortgage, and a copy of the Note indorsed from American Home Mortgage to CitiMortgage. As this Court

previously noted, the State Court "granted Bayview's motion to substitute CitiMortgage as plaintiff based on the assignment of the Mortgage from Bayview to CitiMortgage and CitiMortgage's possession of the original Note bearing an indorsement to CitiMortgage." Stay Relief and Abstention Order, 512 B.R. at 596. No entity other than CitiMortgage has asserted that it is entitled to payments under the Note or any other promissory note relating to the Real Estate.

After filing their bankruptcy petition, the Junks commenced an adversary proceeding in which they asserted "essentially the same arguments they were making in South Carolina in support of their position that the Note and the Mortgage are unenforceable." *Id.* at 597 n.17, 622. Because the adversary proceeding was an attempt by the Junks to rehash arguments they had made in the State Court—many of which the State Court had already rejected or called into question—CitiMortgage requested relief from the automatic stay and abstention from the adversary proceeding so that the litigation could continue in the State Court. The Junks opposed both requests. On July 2, 2014, the Court issued the Stay Relief and Abstention Order. In that order, the Court granted CitiMortgage relief from the automatic stay for "cause" under § 362(d)(1) so that it could pursue a State Court judgment and abstained from hearing the adversary proceeding as to the issues to be decided by the State Court. The Junks appealed the Stay Relief and Abstention Order, which was affirmed by both the District Court, Doc. 182, and the Sixth Circuit, Doc. 191.

The Junks engaged in misconduct multiple times during their Chapter 11 case, including making false oaths and failing to observe their duties as debtors in possession. As a result, the Court issued a bench decision ruling that their Chapter 11 case

should be converted to Chapter 7, Doc. 148, and entered an order converting the case on January 13, 2015, Doc. 136, leading to Terlecky's appointment the next day.[1] The Junks appealed the conversion order, which was affirmed by the District Court, Doc. 182, and by the Sixth Circuit on May 19, 2016, Doc. 191. The Junks requested a rehearing from the Sixth Circuit, but the request was denied, and the Sixth Circuit issued its mandate on July 19, 2016. The mandate simply stated that "[p]ursuant to the court's disposition that was filed 05/19/2016 the mandate for this case hereby issues today." Case No. 15–3986, Doc. 26 (6th Cir. July 19, 2016).[2]

After the orders granting relief from stay and converting the case to Chapter 7 became final and nonappealable, Terlecky filed his initial motion for authority to enter into the settlement with CitiMortgage (Doc. 201).[3] A couple of weeks later, the Junks filed a "Joint Petition for a Writ of Prohibition" (the "Writ Petition") (Doc. 203). By the Writ Petition, the Junks sought to prevent the Court from authorizing the settlement between Terlecky and CitiMortgage. The Sixth Circuit, however, entered an order denying the Writ Petition. Doc. 209 at 1.

Terlecky filed an amended motion for approval of the proposed compromise and sale (the "Motion") (Doc. 207) and a Notice of Intent to Seek Injunctive Relief Against the Debtors and Any Parties Claiming By and Through Them (Doc. 208).[4] Acting pro se,[5] the Junks filed an objection to the Motion (the "Objection") (Doc. 216). CitiMortgage filed a reply to the Objection (Doc. 218), as did Terlecky (Doc. 219). On March 23, 2017, a hearing on the Motion was held at which Terlecky testified and his Exhibits A–F were admitted into evidence without objection. The Junks presented no evidence in support of the Objection, but upon their request the Court did take judicial notice of the existence of a letter dated August 28, 2014 that they had

1. Following the conversion ruling, the United States Trustee commenced an adversary proceeding in which he objected to the Junks' discharge based on the false oaths they had made in their monthly operating reports. Adv. Pro. No. 15–2064. The United States Trustee and the Junks then entered into a stipulation and agreed order in which they agreed to waive their discharge. Adv. Pro. No. 15–2064, Doc. 9. The order also provided for the denial of their discharge. *Id.*

2. "The effect of the mandate is to bring the proceedings in a case on appeal . . . to a close and to remove it from the jurisdiction of [the court of appeals], returning it to the forum whence it came." *Ostrer v. United States,* 584 F.2d 594, 598 (2d Cir. 1978). Of course, a lower court "has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R.R. Co.,* 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948).

3. According to a status report filed by CitiMortgage in the adversary proceeding, the State Court has "unofficially stay[ed] the fore-

closure case to allow for this Court's consideration" of the settlement between Terlecky and CitiMortgage. Adv. Pro. No. 13–2390, Doc. 347.

4. During a telephonic conference call, certain issues with Terlecky's initial motion were conveyed to counsel for the parties to the settlement (Terlecky and CitiMortgage) as well as to bankruptcy counsel for the Junks. Contrary to the Junks' professed "understanding of the conference," Writ Pet. at 4, no suggestion was made during the conference call that the relief requested by Terlecky would be granted so long as he addressed the Court's initial concerns.

5. The Junks were represented by bankruptcy counsel when they commenced their Chapter 11 case, but those attorneys later withdrew. A different set of bankruptcy attorneys began representing the Junks shortly before and after the conversion of their case to Chapter 7 (including during the conference call discussed in footnote 4), but those attorneys also withdrew from the representation. *See* Docs. 120 & 215.

attached as an exhibit to their motion to vacate the Stay Relief and Abstention Order (Adv. Pro. No. 13–2390, Doc. 321).[6] In addition, at the request of the Junks, counsel for CitiMortgage stipulated to the existence of an internet article referencing a proposed sale of CitiMortgage's mortgage servicing business to a third party.

### III. Jurisdiction and Constitutional Authority

Unsatisfied with Terlecky's decision to enter into a settlement with CitiMortgage, the Junks attack the subject matter jurisdiction and the constitutional authority of the Court to approve the settlement. But this is a core proceeding, *see* 28 U.S.C. § 157(b)(2)(A), (N) and (O), and there is no doubt that the Court has the subject matter jurisdiction to hear and determine the Motion under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district.

▮ The Court also has the constitutional authority to enter a final order approving the Motion. For even after *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), bankruptcy courts have the constitutional authority to enter final orders approving settlements under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)"). *See Realan Inv. Partners, LLLP v. Meininger (In re Land Res., LLC)*, 505 B.R. 571, 580–82 (M.D. Fla. 2014); *In re Ambac Fin. Grp., Inc.*, 457 B.R. 299, 308 (Bankr. S.D.N.Y. 2011), *aff'd*, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 Fed.Appx. 663 (2d Cir. 2012). In connection with approving settlements, bankruptcy courts also have the constitutional authority to enjoin third parties from asserting claims that are property of a debtor's bankruptcy estate. *See Marshall v. Picard (In re Bernard L. Madoff Inv.*

*Sec. LLC)*, 740 F.3d 81, 95 (2d Cir. 2014); *In re Nicole Gas Prod.*, 518 B.R. 429, 431 (Bankr. S.D. Ohio 2014). The constitutional authority to enter a final order also extends to Terlecky's request to sell property of the estate under § 363(b) of the Bankruptcy Code. *See Watson v. LLP Mortg., Ltd (In re Watson)*, No. 3:2011–0012, 2016 WL 3349666, at *8–10 (D.V.I. June 15, 2016); *In re Motors Liquidation Co.*, 522 B.R. 13, 27 (Bankr. S.D.N.Y. 2014); *Ritenour v. Osborne*, No. 10–60274–KMM, 2012 WL 912947, at *2 (S.D. Fla. Mar. 16, 2012).

▮ The Junks take the position that the Court was deprived of the jurisdiction and constitutional authority it otherwise had to approve the settlement because it issued the Stay Relief and Abstention Order and the Sixth Circuit issued its mandate in the appeal of that order. *See* Obj. at 6 (arguing that the Court "surrender[ed] jurisdiction" to the State Court); *id.* at 7 (arguing that, as a result of the Sixth Circuit's mandate, the Court "lacks the Constitutional authority to approve the [c]ompromise without a final non-appealable order" by the State Court adjudicating, among other things, the enforceability of the Note and the Mortgage). The basis for the purported loss of jurisdiction and constitutional authority is that, according to the Junks, approval of the settlement would adjudicate issues to be decided by the State Court, including the issue of whether the Note and the Mortgage are enforceable. Obj. at 6, 7. In other words, their position is predicated on the notion that approval of a settlement adjudicates the merits of the underlying claims. But this argument is either frivolous or it is based on a fundamental misunderstanding of what happens when a court approves a

---

**6.** The Court denied the Junks' motion to vacate as well as a subsequent motion they filed seeking to vacate the Stay Relief and Absten- tion Order. *See* Adv. Pro. No. 13–2390, Docs. 322 & 330.

settlement. Approval of a settlement in no way constitutes an adjudication of the merits of the claims being settled. *See Ashton Revocable Living Tr. v. Mukamal (In re Palm Beach Fin. Partners, L.P.)*, 527 B.R. 518, 523 (S.D. Fla. 2015); *Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 526 (S.D.N.Y. 2007), *aff'd*, 309 Fed. Appx. 455 (2d Cir. 2009); *Ambac Fin. Grp.*, 457 B.R. at 308.[7]

In fact, in its order denying the Writ Petition, the Sixth Circuit itself recognized Terlecky's authority to enter into a settlement with CitiMortgage and this Court's jurisdiction to approve the settlement:

> [a] writ of prohibition is a drastic and extraordinary remedy ... only used in exceptional circumstances amounting to a judicial usurpation of power. ... The bankruptcy court is not acting outside its jurisdiction, given that the trustee has the authority to seek a compromise or settlement of claims available to the debtors, upon motion and after notice and a hearing. The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims. ... The bankruptcy court has significant discretion to approve ... a proposed settlement. And, upon the bankruptcy court's approval of a compromise, the [Junks] may appeal. Thus, the [Junks] do not have a clear and indisputable right to relief.

Doc. 209 at 2 (citations and internal quotation marks omitted).

When the Court noted this passage from the order denying the Writ Petition during the hearing on the Motion, the Junks' response was that the Sixth Circuit mentioned *jurisdiction* only and that the Court therefore still lacked the *constitutional authority* to approve the settlement. But given that approval of a settlement in no way adjudicates the merits of the underlying claims, there is simply no basis for the Junks' contention that the Court lacks the constitutional authority to approve the Motion. Indeed, the Junks argued in the Writ Petition that the Court did not have the constitutional authority to approve a settlement between Terlecky and CitiMortgage. Writ Pet. at 7–8. And although the Sixth Circuit did not use the phrase "constitutional authority," it effectively rejected the Junks' argument in this regard when it stated in its order denying the Writ Petition that "upon the bankruptcy court's approval of a compromise, the [Junks] may appeal." Doc. 209 at 2. The Sixth Circuit, of course, would not have denied the Writ Petition based on the Junks' right to appeal this Court's order approving a settlement if it believed the Court lacked the constitutional authority to approve the settlement. For all these reasons, the Court has the jurisdiction and the constitutional authority to enter a final order adjudicating the Motion.

---

7. One purpose of a settlement is to obviate the need for an adjudication of the merits. But if the Junks were correct that a settlement between Terlecky and CitiMortgage could be approved only after the State Court entered a final, nonappealable order adjudicating the merits, there would be no possibility of a settlement. For why would CitiMortgage be willing to enter into a settlement after the entry of an order by the State Court in its favor, and why would Terlecky be willing to do so if he were to prevail? Of course, neither would be willing to settle under such circumstances, and that is precisely the result the Junks are hoping to achieve—that is, to derail the settlement. *See* Obj. at 8 ("[T]he parties need to resolve their differences through completing the adversarial proceeding before the state courts in South Carolina and submit those finally litigated results to this Court for final determination ....").

## IV. Summary of the Motion, the Sale and the Compromise

Terlecky moves under Bankruptcy Rule 9019(a) for an order approving the compromise with CitiMortgage (and its affiliates, predecessors or successors in interest) regarding various claims related to the Real Estate. As a part of the compromise, he seeks an order under § 363(b) of the Bankruptcy Code authorizing him to sell the Real Estate and an additional area of land adjacent to the Real Estate (the "Adjacent Land") to CitiMortgage. According to Terlecky, the Adjacent Land is a small piece of property at the back of the Real Estate that abuts a golf course and that "is of no practical use to anyone except the owner of the Real Estate." Mot. at 5. The Trustee proposes to transfer the Real Estate and the Adjacent Land to CitiMortgage subject to: (1) the Mortgage (which encumbers only the Real Estate); (2) real estate taxes and assessments; and (3) easements, restrictions and covenants of record, but free and clear of "all other liens, claims, encumbrances, and tenancies, including the rights of any occupants and parties in possession." *Id.* at 1.

These and the other terms of the compromise between Terlecky and CitiMortgage are set forth in: (1) the agreement attached as Exhibit D to the Motion; and (2) Terlecky's reply, in which he noted that CitiMortgage originally agreed to pay $60,000 but increased its offer to $65,000 after the Junks offered that amount (collectively, the "Agreement"). To summarize, under the terms of the Agreement:[8]

- CitiMortage will pay Terlecky $65,000 and will subordinate any

claim it has in this case to the claims of other creditors.

- In exchange, Terlecky will: (1) sell the Real Estate (subject to the Mortgage) and the Adjacent Land to CitiMortgage; (2) sell to CitiMortgage the claims that were asserted by, or could have been asserted by, the Junks in the bankruptcy case, adversary proceeding and the State Court litigation; and (3) sell to CitiMortgage any other claims which were asserted by, or could have been asserted by, the Junks arising in, out of, or related to the Real Estate or the mortgage loan evidenced by the Note and the Mortgage (except for claims for rent against any current occupants up to the effective date of the Agreement).

- Terlecky also agreed to seek to enjoin the Junks, and any parties claiming by and through them, from taking action against CitiMortage or any of the other defendants in the adversary proceeding based on claims that are being resolved through the Agreement.[9]

Mot. at 6–8.

In addition to requesting approval of the compromise and the sale, Terlecky requests relief from the 14–day stay of sale orders imposed by Bankruptcy Rule 6004(h).

## V. The Objection

Terlecky contends that the Junks lack standing to object to the settlement because this is not a case in which estate assets will result in a surplus distributable to the debtors. *See* Doc. 219 at 5–6. But

8. The Court is granting the Motion (other than the request for relief from the 14–day stay) in its entirety, and also is approving the Agreement in its entirety, and nothing contained in or omitted from this summary should be construed to suggest otherwise.

9. Terlecky also has filed a separate notice of his intent to seek this injunctive relief. Doc. 208.

the Court has an independent duty to ensure that settlements are fair and equitable and thus "has a role to play in approving compromises, even in the absence of any objection." *In re Rake*, 363 B.R. 146, 151 (Bankr. D. Idaho 2007). In an effort to exercise that role to the fullest extent possible, the Court considered the Objection and permitted the Junks to appear and be heard on the Motion. The Objection, however, fails to provide a single non-frivolous reason for denying the Motion and in fact helps make Terlecky's case for the relief requested. Thus, it will be helpful to analyze the Objection before discussing why the Motion should be granted.

■ In the Objection, the Junks represent that they will pay Terlecky $65,000 (the same amount CitiMortgage has offered to pay) in exchange for the estates' claims against CitiMortgage. The Junks propose that "[t]o the extent [they] are successful in litigating those claims," their bankruptcy estates "will be entitled to [75%] of the proceeds." Obj. at 2. In other words, they are inviting Terlecky to entrust them with the estates' claims in exchange for the same amount of cash that CitiMortgage is willing to pay, plus the hope that there might be more available after they litigate with CitiMortgage and, in their view, establish that the Mortgage encumbering the Real Estate is unenforceable. But the manner in which the Junks approached the State Court litigation before filing bankruptcy provides no reason to believe that they would have any chance of successfully litigating with CitiMortgage in the future. After all, as discussed above, Mr. Junk previously asserted a plethora of arguments that the State Court found untenable, including the argument that an unknown entity that has never come for-

ward might someday appear and assert a claim under the notes and the mortgage that the Junks executed in 2005. *See* Stay Relief and Abstention Order, 512 B.R. at 595–96.

As also discussed above, the Junks "receiv[ed] one adverse ruling after another" in the State Court, and those rulings resulted in the dismissal with prejudice of each of the claims they asserted against CitiMortgage. *Id.* at 586, 601. As a result, all that remains for the State Court to decide is CitiMortgage's claims against the Junks and their defenses to the enforceability of the Note and the Mortgage. The Junks have provided no reason to believe that they would be any more successful in asserting their defenses than they were in prosecuting their claims.[10]

There are other reasons for Terlecky not to entrust the claims to the Junks. The Sixth Circuit previously issued an order in this case in which it concluded that they "have 'substantially prolonged' the litigation by 'abusing the processes provided' to them," Doc. 189 at 2, and the Junks have done so again by filing the Objection. For one, they mischaracterized certain statements Terlecky made in the Motion. They contend that he "misstates the facts" of the Junks' claim against CitiMortgage for rescission. Obj. at 4. This is simply not true. With respect to rescission, Terlecky stated only that the Junks "fail[ed] to make required payments on the Note and Mortgage beginning in March 2009" and that "the [Junks] sent a letter claiming the mortgage loan had been rescinded by them." Mot. at 3. And those representations are certainly accurate. Notwithstanding the Junks' position that the Note and the Mortgage are unenforceable, there is

10. The Junks attached as Exhibit A to the Objection an unsworn statement by an attorney who claims to be "an expert in the sale of mortgage loans between financial institu-

tions," Ex. A, but the attorney did not appear at the hearing on the Motion or provide any testimony in support of the Objection.

no question that the terms of the Note require certain payments to be made, and the Junks themselves do not contend that they continued making payments on the Note after they sent their notice of rescission. Obj. at 4.[11]

Even more disturbing is the Junks' continued reliance on their rescission claim despite the State Court's dismissal of the claim with prejudice. And Mr. Junk was even brazen enough to state in closing argument that this Court previously found that the Junks "in fact exercised our [rescission] rights." His statement was demonstrably false, and the Court previously made clear that it was false when it denied the Junks' request for a stay of the order converting their case to Chapter 7:.

In arguing that they will be irreparably harmed absent a stay, the Junks first make misrepresentations related to their purported rescission of the Note and the Mortgage. They state that "[i]f these proceedings are not stayed, the Junks will be forced to continue to seek finality of judgment as to [CitiMortgage's] status as a secured creditor despite this Court's previous finding in [the Stay Relief and Abstention Order] that [they] exercised their right under TILA to rescind that same transaction which is the source of [its] claimed secured status." ... The Junks' representation that the Court made a "previous finding" in the Stay Relief and Abstention Order that they "exercised their right under [TILA] to rescind th[e] transaction" giving rise to the Note and the Mortgage is simply false. The Court made no such finding. While the Court did find that the Junks

11. The Junks incorrectly contend that Terlecky "materially misstates" other facts in the record. Obj. at 3. As the Junks point out, Terlecky did indeed state in the Motion that the original purchase price for the Real Estate before the Junks refinanced was $1.25 million rather than the actual amount of $1.125 million, and he identified the original mortgage lender as "American Home Mortgage, Inc." rather than using the correct name "American Home Mortgage" without the "Inc.," Mot. at 3. But any suggestion that this lack of precision is in any way material to the Motion cannot be taken seriously. Further, the Junks have misconstrued another statement made by Terlecky in the Motion. They represent that "in ¶ 6 [of the Motion], Terlecky states that MERS was the mortgagee as nominee for American Home Mortgage when in fact the Junks denied that MERS was the mortgagee as nominee of American Home Mortgage ...." Obj. at 4. But Terlecky did not state that MERS *was* the nominee. Rather, he stated only that "the loan documents *named* ... MERS as the nominee." Mot. at 3 (emphasis added). And that statement is undeniably true. *See* Stay Relief and Abstention Order, 512 B.R. at 590 ("The Mortgage named MERS as the mortgagee as nominee for American Home Mortgage and its successors and assigns."). The Junks also attempt to take Terlecky to task for "omit[ting] facts already in the record." Obj. at 3. As they point out, the Motion includes no discussion of certain allegations they made in their adversary complaint and does not mention that a defendant other than CitiMortgage (i.e., Steven D. Sass as Plan Trustee of the American Home Mortgage Plan Trust) failed to answer the complaint and therefore might be deemed to have admitted those allegations. Obj. at 3–4. American Home Mortgage transferred its interest in the Note and the Mortgage long before the Junks commenced the adversary proceeding, and thus no admission by Mr. Sass could possibly be binding on CitiMortgage. *See State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 519 n.9 (10th Cir. 1994); *Liberi v. Taitz*, No. 11–0485, 2012 WL 10919114, at *8 (C.D. Cal. Mar. 16, 2012). There is no evidence that CitiMortgage has admitted the specific allegations of the Junks' adversary complaint that they claim Mr. Sass admitted by his default, yet Terlecky did not discuss CitiMortgage's failure to admit those allegations. In other words, Terlecky neglected to mention that the Junks made certain allegations and that CitiMortgage has not admitted those allegations. But so what? The Junks and CitiMortage clearly dispute most of the underlying facts, and Terlecky's failure to discuss certain of those disputed facts hardly provides a reason to deny the Motion.

sent a notice *purporting* to rescind the Note and the Mortgage, the Court also found that [the State Court] dismissed the Junks' rescission claim under TILA with prejudice .... It is simply inconceivable that anyone who has read the Stay Relief and Abstention Order could justifiably conclude that it contained the finding the Junks seek to attribute to the Court.

*McDermott v. Junk (In re Junk)*, 533 B.R. 639, 649–50 (Bankr. S.D. Ohio 2015) (footnotes and citations omitted). The Junks' continued reliance on an egregiously misleading characterization of the Stay Relief and Abstention Order provides just one more example of their untrustworthiness. In addition, the dismissed rescission claim is one of the cornerstones of the Objection, and the Junks' persistent refusal to acknowledge the dismissal of that claim with prejudice further undercuts their already shaky credibility.

Furthermore, nothing in the United States Supreme Court decision on which the Junks rely—*Jesinoski v. Countrywide Home Loans, Inc.*, —— U.S. ——, 135 S.Ct. 790, 190 L.Ed.2d 650 (2015)—suggests that the State Court would reconsider its dismissal of their rescission claim, if that is even possible at this point. As discussed above, the State Court dismissed the rescission claim with prejudice for two reasons. The first reason was the Junks' failure to "plead or otherwise allege ... that they possessed the ability to tender the loan proceeds as required to maintain a TILA rescission counterclaim." Stay Relief and Abstention Order, 512 B.R. at 601. In *Jesinoski*, the Supreme Court held that "a borrower need only provide written notice to a lender in order to exercise his right to rescind," and that TILA "disclaims the common-law *condition prece-*

*dent to rescission* at law that the borrower tender the proceeds received under the transaction." *Id.* at 793 (emphasis added). In other words, under *Jesinoski*, there is no requirement that a borrower tender the loan proceeds before or at the time he or she sends the rescission notice in order for the notice to be effective. But as other courts have pointed out, nothing in *Jesinoski* alters the requirement that a plaintiff have the ability to tender the loan proceeds after sending the rescission notice in order to successfully assert a TILA rescission claim. *See Gilbert v. Deutsche Bank Tr. Co. Ams.*, No. 4:09–CV–181–D, 2017 WL 1012981, at *2 (E.D.N.C. Mar. 14, 2017) ("*Jesinoski* did not invalidate Fourth Circuit precedent holding that the ability to tender is a necessary predicate before a court may order rescission.");[12] *Jesinoski v. Countrywide Home Loans, Inc.*, 196 F.Supp.3d 956, 961–62 (D. Minn. 2016) (holding that a rescission claim under TILA is "conditioned on repayment of the amounts advanced by the lender" and that "nothing in the Supreme Court's opinion [in *Jesinoski*] ... override[s] TILA's tender requirement"), *appeal docketed*, No. 16–3385 (8th Cir. Aug. 17, 2016); *Brown v. Gorman*, No. 1:15–CV–01265, 2016 WL 3702974, at *3–4 (E.D. Va. July 7, 2016) (same), *aff'd*, No. 16–1899, —— Fed.Appx. ——, 2017 WL 1032086 (4th Cir. Mar. 16, 2017). And the failure to plead the ability to tender is one reason the State Court dismissed the Junks' rescission claim. Moreover, the State Court determined that rescission is not what the Junks truly want, noting that they instead are "seek[ing] to avoid their mortgage obligation altogether while keeping the house." Stay Relief and Abstention Order, 512 B.R. at 601.

---

12. In analyzing the Junks' TILA rescission claim, the State Court looked to the law of the Fourth Circuit because appeals from South Carolina federal district courts are heard by that circuit court of appeals.

· The State Court dismissed the rescission claim for the additional reason that it was untimely. Under TILA, borrowers have three days after a transaction is consummated to send a rescission notice unless certain circumstances are present, in which case the rescission period is extended to three years. The State Court determined that the three-day period applied and that the Junks' rescission notice was untimely because they sent it nearly three years after they signed the Note and the Mortgage. *See id.* And there is nothing whatsoever in *Jesinoski* suggesting that the Supreme Court intended to afford borrowers a three-year period to rescind under circumstances in which TILA gives them only three days. *See Csoka v. Bank of Am., N.A.*, No. 1:15–cv–0876, 2016 WL 270302, at * 3–4 (E.D. Va. Jan. 21, 2016). In sum, *Jesinoski* offers no support for the Junks' position, which is based on a rescission claim that the State Court dismissed with prejudice long ago.

In the Objection, the Junks also point out that Terlecky omitted from the Motion the fact that CitiMortgage filed a motion for relief from the automatic stay under § 362(d)(1) and (d)(2), but that the motion was granted only under § 362(d)(1). In the Stay Relief and Abstention Order, the Court stated that "lack of equity is a predicate to granting relief from stay under § 362(d)(2)," and held that CitiMortgage was not entitled to relief from the automatic stay under § 362(d)(2) at that time because granting it such relief "effectively would be adjudicating the issue of the enforceability of the Note and the Mortgage, an issue that … should be determined by the South Carolina state courts." Stay Relief and Abstention Order, 512 B.R. at 605. Again, the Sixth Circuit issued a mandate after it upheld the Stay Relief and Abstention Order, and based on that mandate the Junks argue that approval of the Motion "would impermissibly decide what the Sixth Circuit has mandated can only be decided by the state courts of South Carolina." Obj. at 8. That is, the Junks rely once again on the mistaken notion that approval of the Motion is tantamount to deciding the merits of the claims that would be litigated in the State Court. As already discussed, however, a court does not adjudicate the underlying merits when it approves a settlement. Approval of the Motion accordingly would not constitute an adjudication of the issue of whether the Note and the Mortgage are enforceable or the issue of whether CitiMortgage has equity in the Real Estate. For that reason alone, it is clear that an order granting the Motion would not contravene the Sixth Circuit's mandate. And given that the Sixth Circuit expressly recognized in its order denying the Writ Petition that this Court would have the jurisdiction to approve a settlement between Terlecky and CitiMortgage, there is simply no basis for the Junks to argue that approval of the settlement would violate the Sixth Circuit's mandate. By taking this indefensible position, the Junks provide further evidence of their willingness to assert groundless arguments that have no chance of success.

The Junks took another unsupportable position during the hearing when they argued for the first time that the settlement could not be approved because it had been more than two years since Terlecky's appointment as the Chapter 7 trustee. According to the Junks, Terlecky had only two years from his appointment to either administer the Junks' bankruptcy estates or abandon the estates' claims against CitiMortgage to them. But they offered no authority for this argument, and indeed none exists. There is nothing whatsoever in the Bankruptcy Code, the Bankruptcy Rules or decisional law that would support the existence of any such two-year deadline.

As part of their offer to Terlecky, the Junks propose that they would be represented by counsel in the State Court. *See* Obj. at 2. Perhaps the reason they made that proposal was to address concerns about the quality of their arguments. But although the Junks currently are acting pro se, they have been represented by multiple sets of bankruptcy attorneys (as well as special counsel in the adversary proceeding). And yet that did not dissuade them from asserting nonsensical arguments throughout the bankruptcy case and adversary proceeding even while represented by counsel.

Concluding their opposition to the Motion, the Junks go so far as to ask the Court to enter an order "accepting [their] [o]ffer." Obj. at 14. But of course "[i]t is well-settled that a court cannot force a party to settle," *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 382 (S.D.N.Y. 2011), and for the reasons already explained, the Court would not require Terlecky to enter into a settlement with the Junks even if it could do so. Instead, it is the settlement with CitiMortgage that should be approved.

## VI. Approval of the Settlement, the Injunction and the Sale

Because the Agreement effectuates both a settlement and a sale, the Motion must be evaluated under the fair-and-equitable standard used to analyze settlements under Bankruptcy Rule 9019 and under the sound-business-purpose test that courts apply in evaluating sales of property of the estate under § 363 of the Bankruptcy Code.

### A. The Settlement

Bankruptcy courts have "significant discretion to approve ... a [trustee's] proposed settlement by virtue of Bankruptcy Rule 9019(a), which directs that '[o]n motion by the trustee and after

notice and a hearing, the court may approve a compromise or settlement.'" *Rankin v. Brian Lavan & Assocs., P.C. (In re Rankin)*, 438 Fed.Appx. 420, 426 (6th Cir. 2011). Outside of bankruptcy, parties generally are free to settle on terms of their own choosing. But "[t]he fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine" whether a settlement should be approved. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

The proponent of a proposed compromise—here, Terlecky—"has the burden of persuading the [C]ourt that the settlement is in the best interest of the estate and should be approved." *In re Tennol Energy Co.*, 127 B.R. 820, 828 (Bankr. E.D. Tenn. 1991). But the Court has an independent role to play. Given the effect that settlements can have on the estate and creditors, bankruptcy courts must exercise their "informed, independent judgment" to determine that a proposed settlement is "fair and equitable." *Id.*; *see also Hindelang v. Mid–State Aftermarket Body Parts Inc. (In re MQVP, Inc.)*, 477 Fed. Appx. 310, 313 (6th Cir. 2012) (requiring bankruptcy courts to apply the fair-and-equitable standard to evaluate proposed compromises). Thus, "[w]hen determining whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement or merely rely upon the trustee's word that the settlement is reasonable." *MQVP, Inc.*, 477 Fed.Appx. at 313. "Rather, 'the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equita-

ble.' " *Id.* (quoting *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988)).

■ That said, "[a] bankruptcy judge need not hold a mini-trial," *id.* because "an exact judicial determination . . . would defeat the purpose of compromising the claim," *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (quoting *In re Energy Coop., Inc.*, 886 F.2d 921, 929 (7th Cir. 1989)). Instead, when evaluating settlements under Bankruptcy Rule 9019(a), courts must canvass the issues in order to determine whether the settlement falls below the lowest point in the range of reasonableness, and if the settlement falls within a range of reasonable compromises, it may be approved. *See Nicole Gas Prod.*, 518 B.R. at 441.

■ In assessing whether a proposed settlement meets the fair-and-equitable standard, courts generally consider four factors: (1) the probability of success in the litigation to be settled; (2) the difficulties, if any, to be encountered in collecting from the defendant; (3) the complexity, expense and delay that would be involved in the litigation; and (4) the paramount interest of the creditors, giving proper deference to their reasonable views. *See MQVP, Inc.*, 477 Fed.Appx. at 313 (quoting *In re Bard*, 49 Fed.Appx. 528, 530 (6th Cir. 2002)). Consideration of these four factors here makes it clear that Terlecky has met his burden of showing that the proposed settlement with Citi-Mortgage is within the range of reasonableness and is both fair and equitable and in the best interest of the Junks' bankruptcy estates.

■ The probability-of-success factor requires courts to estimate "the likely outcome of litigating the claims proposed to be settled." *Telesphere*, 179 B.R. at 553. Based on the record, it appears highly unlikely that continued litigation with Citi-Mortgage in the State Court would confer any benefit on the Junks' bankruptcy estates. As discussed above, the State Court dismissed with prejudice each of the claims the Junks asserted against Citi-Mortgage. Thus, if the settlement were not approved, all that would remain for the State Court to decide would be CitiMortgage's claims against the Junks and their defenses to the enforceability of the Note and the Mortgage. The State Court has already expressed considerable doubt as to certain of the Junks' arguments, and there is no reason to believe that the State Court would find their arguments about the purported non-enforceability of the Note and the Mortgage any more persuasive than the Junks' other arguments. On that point, it bears noting that "[a]lthough th[is] Court [did] not decide the issue," it previously pointed out that the Junks' "argument that the Note is unenforceable because it was split from the Mortgage appears to have no viability." Stay Relief and Abstention Order, 512 B.R. at 620 n.34; *see also id.* at 620 (noting that several of the arguments the Junks were making in the State Court against the enforceability of the Note and the Mortgage had been rejected by other courts). In short, the arguments the Junks have made in the State Court to challenge the enforceability of the Note and the Mortgage appear to be as weak as those they have asserted in opposing the Motion. In any event, "there are substantial and reasonable doubts" about the arguments the Junks have made in the State Court. *TMT Trailer*, 390 U.S. at 424, 88 S.Ct. 1157. And as the Sixth Circuit has noted, "[t]he very purpose of . . . a compromise agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *MQVP, Inc.*, 477 Fed.Appx. at 312 (quoting *Bard*, 49 Fed.Appx. at 530). The probability-of-success factor therefore weighs heavily in favor of approving the settlement with CitiMortgage.

The difficulty-of-collection factor does not weigh in the calculus here. For as both Terlecky and CitiMortgage concede, there would be no difficulty recovering the value of the Real Estate if the Mortgage were found to be unenforceable. But the complexity of the litigation and the attendant delay tip the scales even further in favor of the settlement. Given the allegations that the Junks made in the litigation in the State Court (and in this Court), it is clear that any litigation with CitiMortgage in the State Court would be highly fact intensive. And delay is inherent in such litigation. *See Fishell v. Soltow (In re Fishell),* No. 94–1109, 1995 WL 66622, at *4 (6th Cir. Feb. 16, 1995) ("The fact-intensive nature of the dispute also means that any litigation would be time-consuming[.]"). Distributions to unsecured creditors would be further delayed while the litigation was pending, a result Terlecky determined would only harm creditors. Thus, the fact-intensive nature of the litigation—and the attendant delay in distributions to creditors—is a factor weighing heavily in favor of approval of the settlement with Citi-Mortgage. *See Bard,* 49 Fed.Appx. at 532 ("[T]he court's recognition of the ... delay inherent in any trial ... supports the ultimate conclusion of the bankruptcy judge to grant the motion to accept the compromise.").

The interests-of-creditors factor also supports the settlement. Terlecky provided adequate notice of the Motion to all creditors, and no creditor has filed an objection to the Motion. Indeed, it is clear that the interests of creditors will be served by approving the settlement with CitiMortgage. The value of the settlement to creditors derives in part from the fact that Terlecky will avoid incurring attorneys' fees and expenses litigating with CitiMortgage over the validity and amount of its claim. And rather than engaging in claims litigation with CitiMortgage, Terlecky instead will receive funds from Citi-

Mortgage that will be used to promptly pay creditors' claims. In addition, CitiMortage will subordinate its claim to the claims of the other creditors holding allowed claims, thereby increasing the distributions to other creditors.

Raising an issue during the hearing on the Motion that they did not assert in the Objection, the Junks argue that the subordination of the CitiMortgage claim is a "red herring." In support of this argument, they rely on the fact that CitiMortgage attached to Claim 6–3 a copy of the State Court Complaint, which provides that the "right to a personal or deficiency judgment [against the Junks] ... is expressly waived." Claim 6–3, State Court Compl. ¶ 30. According to the Junks, this means that CitiMortgage does not have a monetary claim, it thus is not entitled to receive a distribution in their bankruptcy case, and thus the subordination of CitiMortgage's claim provides no value to creditors. But even if the subordination of CitiMortgage's claim had no value, Terlecky still would be receiving $65,000 in exchange for the Real Estate, the Adjacent Land and the estates' claims against CitiMortgage. And $65,000 is well within the range of reasonableness considering: (1) the existence of the Mortgage on the Real Estate; (2) the lack of evidence that the Real Estate would have any value to the bankruptcy estates if the Mortgage is enforceable; (3) the extremely low probability that further litigation in South Carolina would result in a holding by the State Court that the Mortgage on the Real Estate is unenforceable; and (4) the fact that the Adjacent Land is of no practical use to anyone other than the owner of the Real Estate. Thus, the argument that the subordination of CitiMortgage's claim has no value provides no reason to deny the Motion.

The Junks also argue that CitiMortgage could not receive a distribution as an unse-

cured creditor because it filed Claim 6–3 as a fully secured claim. As Terlecky pointed out, however, CitiMortgage could seek to file an amended unsecured proof of claim. *See In re Channakhon*, 465 B.R. 132, 145 (Bankr. S.D. Ohio 2012) (holding that a creditor that filed an amended unsecured claim after having filed a secured claim "may participate in the pro rata distribution of property that the Trustee will be making to the holders of general unsecured claims"). Furthermore, counsel for CitiMortgage argued that, notwithstanding the waiver of the deficiency set forth in the State Court Complaint, CitiMortgage nonetheless would be entitled to a distribution in the Junks' bankruptcy case so long as the South Carolina litigation failed to result in a foreclosure sale. *See also* Stay Relief and Abstention Order, 512 B.R. at 613 (noting that South Carolina law suggests that "the waiver of the deficiency is irrelevant if there is never a foreclosure sale"). In CitiMortgage's view, the only possible scenario in which it would not be entitled to a deficiency claim is if it prevailed in the State Court litigation. And if it were to prevail in the State Court, the Real Estate would be of no value to the bankruptcy estates.

In short, as Terlecky explained during the hearing, the subordination of CitiMortgage's claim is a valuable component of the settlement. If CitiMortgage is entitled to a distribution on its deficiency claim, then the subordination provides value to the estate by increasing the distributions to other creditors. And even if there is some question as to whether CitiMortgage is entitled to such a distribution, CitiMortgage's subordination provides value by eliminating the need for Terlecky to litigate the issue with CitiMortgage. In sum, failing to approve the settlement would lead to estate-depleting claims litigation with CitiMortgage, while approving the settlement will provide creditors with a prompt distribution on their allowed claims.

In the end, Terlecky accepted CitiMortgage's offer because it provides him with cash proceeds of $65,000—an amount that, in light of CitiMortgage's subordination of its claim, will provide a distribution to other parties holding claims against the Junks' estates in short order. In addition, the settlement with CitiMortgage will result in the dismissal of all of the claims in the adversary proceeding. By contrast, the Junks' offer provides Terlecky with $65,000 and little hope of anything more—other than litigation with CitiMortgage over the enforceability of its Mortgage and the amount of its claim. In the meantime, because CitiMortgage would not subordinate its claim if Terlecky entered into a settlement with the Junks, Terlecky could not make distributions to other creditors while questions about the validity and amount of CitiMortgage's claim remained pending. For all these reasons, the settlement with CitiMortgage clearly is fair and equitable and in the best interests of creditors.

## B. The Injunction

Terlecky seeks to enjoin the Junks and any parties claiming by and through them from taking actions against CitiMortage and its successors-in-interest—as well as any of the other defendants in the adversary proceedings—based on claims that were resolved through the Agreement. Under § 105(a) of the Bankruptcy Code, a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). It is well-settled that this section provides "bankruptcy court[s] [the] power to enjoin suits against non-parties in state court if failure to enjoin would adversely affect [the] bankruptcy estate. ..." *Nicole Gas*

*Prod.*, 518 B.R. at 443 (Bankr. S.D. Ohio 2014). The claims the Junks held against CitiMortgage and the other defendants in the adversary proceeding are property of their bankruptcy estates. *See Parker v. Goodman (In re Parker)*, 499 F.3d 616, 624 (6th Cir.2007). Because the claims are property of the estate, the Court may enjoin parties other than Terlecky—including the Junks—from asserting the claims. *See Allard v. DeLorean (In re DeLorean Motor Co.)*, No. 88–1275, 1989 WL 63256, at *2 (6th Cir. June 14, 1989); *Nicole Gas Prod.*, 518 B.R. at 443.

CitiMortgage has made the injunction a term of the settlement. Thus, the failure to enjoin the Junks from pursuing claims that were resolved through the Agreement would adversely affect the bankruptcy estate by permitting entities other than Terlecky to assert those claims, scuttling the settlement he struck with CitiMortgage, to the detriment of the Junks' creditors. Under these circumstances, the injunction requested by Terlecky is warranted. *See Nicole Gas Prod.*, 518 B.R. at 443 (approving injunction against the pursuit of claims because the failure to impose the injunction would adversely affect the estate by permitting entities other than the Chapter 7 trustee to assert the claims and thereby threaten the settlement).

Based on an internet article that the Junks brought to the hearing but that was not admissible into evidence,[13] the Junks contend that CitiMortgage has transferred any of its rights in the Note and the Mortgage to another entity. And based on that contention, the Junks argue that the injunction will impermissibly operate to enjoin them from asserting claims against a successor-in-interest to CitiMortgage. There is no evidence in the record that CitiMortgage has transferred its interest in the Note and the Mortgage. But if CitiMortgage has made such a transfer or plans to do so in the future, then so be it. Protecting a successor-in-interest to CitiMortgage is precisely how the injunction should work. For the reasons set forth above, the Court will issue the injunction requested by Terlecky.

## C. The Sale

Section 363(b)(1) of the Bankruptcy Code authorizes a trustee, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Terlecky seeks an order under this section authorizing him to sell to CitiMortgage the Real Estate, the Adjacent Land, and the estates' claims against CitiMortgage. Those assets together constitute substantially all of the Junks' assets. Under the law of the Sixth Circuit, bankruptcy courts may approve a sale of substantially all of a debtor's assets under § 363(b)(1) "when a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). In applying the test formulated by the *Stephens Industries* court, bankruptcy courts generally take the following factors into account: whether the terms of the proposed sale reflect the highest and best offer for the assets, whether the negotiations were conducted at arm's length, and whether the sale is in the best interest of the estate and its creditors. *See In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008). For the reasons already detailed above, application of these factors here leaves no doubt that a sound business reason dictates approval of the sale of the estates' claims against CitiMortgage, as well as the Real Estate and the Adjacent

---

13. As noted earlier, counsel for CitiMortgage stipulated to the existence of an internet article that refers to a proposed sale by CitiMortgage of its mortgage servicing business.

Land, to CitiMortgage under the terms and conditions set forth in the Agreement.

▉ Terlecky also requests that the sale be free and clear of "liens, claims, encumbrances, and tenancies, including the rights of any occupants and parties in possession," other than (1) the Mortgage; (2) real estate taxes and assessments; and (3) easements, restrictions and covenants of record. Mot. at 5, 6. Under § 363(f)(2) of the Bankruptcy Code, a trustee "may sell property [of the estate] free and clear of any interest in such property of an entity other than the estate" if "such entity consents." 11 U.S.C. § 363(f)(2). Failure to object by any party that received notice of the Motion constitutes consent within the meaning of § 363(f)(2) to the sale free and clear. *See, e.g., FutureSource LLC v. Reuters Ltd.,* 312 F.3d 281, 285–86 (7th Cir. 2002). The only parties who objected to the Motion are the Junks. And the interests they had in the Real Estate, the Adjacent Land and their claims against CitiMortgage no longer belong to them; instead, those interests are property of their estates under § 541(a)(1) of the Bankruptcy Code, which makes "all legal or equitable interests of the debtor in property as of the commencement of the case" property of the estate. 11 U.S.C. § 541(a)(1). No other party objected to the sale being a sale free and clear, and Terlecky therefore is authorized to sell the property being sold free and clear (except as stated in the Motion) of all "liens, claims, encumbrances, and tenancies, including the rights of any occupants and parties in possession" of any party that received notice of the Motion.

### 1. Good Faith Finding

▉ Terlecky requests a finding that CitiMortgage will have purchased the claims against it, the Real Estate, and the Adjacent Land in "good faith" within the meaning of § 363(m) of the Bankruptcy Code. The Junks oppose such a finding.

▉ "The term 'good faith purchaser' is not defined in the bankruptcy code," but "courts have defined a 'good faith purchaser' as one who purchases the assets 'for value' and 'in good faith.'" *Nicole Energy Servs., Inc. v. McClatchey,* No. 08–CV–0463, 2009 WL 545102, at *3 (S.D. Ohio Mar. 4, 2009). CitiMortgage fits the bill. It is providing value to the Junks' bankruptcy estates in the form of a cash payment and subordination of its claim. In addition, courts base a finding of good faith on the buyer's "conduct in the course of the sale proceedings," *In re Andy Frain Servs., Inc.,* 798 F.2d 1113, 1125 (7th Cir. 1986), and no party pointed to any evidence that CitiMortgage engaged in misconduct in negotiating the settlement and the sale with Terlecky.

In order to demonstrate a lack of good faith on the part of CitiMortgage, the Junks would have needed to show fraud or collusion on the part of Terlecky and CitiMortgage or an attempt by CitiMortgage to take grossly unfair advantage of the Junks in their capacities as the other parties who made an offer to purchase the claims against CitiMortgage. *See Nicole Energy Servs.,* 2009 WL 545102, at *3. There is no evidence of fraud or collusion between Terlecky and CitiMortgage, nor is there any basis to conclude that CitiMortgage is attempting to take grossly unfair advantage of the Junks. Moreover, the settlement is the product of arms-length negotiations between CitiMortgage and Terlecky. For all these reasons, the evidence presented during the hearing demonstrates that CitiMortgage will have purchased the claims against it, as well as the Real Estate and the Adjacent Land, in good faith for purposes of § 363(m) of the Bankruptcy Code.

### 2. Bankruptcy Rule 6004(h)

▉ Under Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." No provision of the Agreement makes Terlecky's obtaining relief from the 14–day stay a condition to the effectiveness of the Agreement. *See* Mot., Ex. D. Terlecky, however, requests relief from the 14–day stay. The Junks oppose this request on the grounds that they will appeal any order approving the sale, and they apparently are concerned that an immediate closing might moot their appeal. For his part, Terlecky stated during the hearing that he was seeking relief from the 14–day stay so that the closing is "not tied up on appeal." It indeed is unfortunate that the Junks intend to pursue an appeal in this case when the arguments they have asserted in opposition to the Motion are so patently meritless.[14] This will no doubt force Terlecky to incur estate-depleting attorneys' fees and costs. But this does not provide a basis to grant relief from the 14–day stay.

Further, the reasons Terlecky gave in the Motion for requesting relief from the stay imposed by Bankruptcy Rule 6004(h) likewise do not support granting his request. Terlecky contends that relief from the 14–day stay is warranted because, according to him, "[i]t would be incongruous for part of the resolution [that is, approval of the settlement] to be effective on entry of an order and part [the sale of the estates' property] to be effective 14 days later." Mot. at 15. If this were a valid reason for granting Terlecky's request, then a trustee would be entitled to relief from the 14–day stay of a sale order any time a sale of estate property is a component of a settlement. But the fact that a

sale has been coupled with a settlement is not a sufficient reason to grant relief from the 14–day stay. Nor is the Court persuaded by Terlecky's argument that "it is important to [CitiMortgage] to have the transfer of the Real Estate and Adjacent Land accomplished at the same time that the Adversary Proceeding and the South Carolina Litigation are dismissed." *Id.* If the transfers and the dismissal could have happened at the same time on the day the Court entered an order approving the Motion, then there is no reason that the events could not happen simultaneously once the 14–day stay expires. Absent a valid explanation for why the closing must occur immediately, Terlecky's and CitiMortgage's desire that the "closing ... occur and ... the real estate documents ... be recorded immediately," *id.* at 16, is not a sufficient basis for granting relief from the 14–day stay. Terlecky's request for relief from the stay imposed by Bankruptcy Rule 6004(h) therefore is denied.

## VII. Conclusion

For the reasons stated above, the Agreement is approved and the order approving the Agreement will include the injunction Terlecky has requested. Terlecky's request for relief from the 14–day stay, however, is denied. The Court hereby directs Terlecky to upload the proposed order attached to the Motion modified so as to be consistent with this opinion.

**IT IS SO ORDERED.**

---

14. The Sixth Circuit previously concluded that the Junks "have 'substantially prolonged' the litigation by 'abusing the processes provided' to them." Doc. 189 at 2. And it is axiomatic that "[f]ederal courts ... have inherent and statutory authority to impose sanc-

tions upon parties for their abuse of the litigation process." *Maloof v. Level Propane Gasses, Inc.*, 316 Fed.Appx. 373, 376 (6th Cir. 2008); *see also Goodyear Tire & Rubber Co. v. Haeger,* —— U.S. ——, 137 S.Ct. 1178, ——, 197 L.Ed.2d 585, 2017 WL 1377379, at *5 (2017).