**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0404n.06

**No. 10-2225**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| In re: MQVP, INC., | ) | |
| | ) | **FILED** |
| Debtor, | ) | *Apr 13, 2012* |
| | ) | LEONARD GREEN, Clerk |
| | ) | |
| WILLIAM HINDELANG and GLOBAL | ) | ON APPEAL FROM THE UNITED |
| ONLINE CERTIFICATIONS, INC., | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MID-STATE AFTERMARKET BODY | ) | |
| PARTS INC., KEYSTONE | ) | |
| AUTOMOTIVE INDUSTRIES, INC., | ) | |
| LKQ CORPORATION, and CHAPTER 7 | ) | |
| TRUSTEE CHARLES J. TAUNT, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

**BEFORE: GIBBONS, GRIFFIN, and DONALD, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** This case arises out of a Chapter 7 bankruptcy proceeding involving debtor MQVP, Inc. Before conversion to Chapter 7, MQVP had been litigating two separate lawsuits alleging trademark infringement. The trustee of the MQVP estate sought approval from the bankruptcy court of a settlement to resolve these suits, which involved a payment of $1.2 million to the estate. Appellants and MQVP creditors William Hindelang and Global Online Certifications, Inc. objected to the proposed settlement on grounds that the trustee had not met his

-1-

burden of showing that the settlement was reasonable.  After a hearing, the bankruptcy court approved the settlement, and the district court subsequently affirmed.

For the following reasons, we affirm.

## I.

Debtor MQVP, Inc. maintained the registered service mark MQVP, which represented a supply chain quality and assurance program in the aftermarket auto crash parts industry.  The purpose of the MQVP program, in which aftermarket car part manufacturers, distributors, and insurance companies participated, was to certify the quality and traceability of aftermarket parts that were manufactured and sold.  On August 17, 2006, MQVP filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code.  On July 18, 2007, the bankruptcy court converted the case to a Chapter 7 proceeding, and Charles J. Taunt was appointed trustee.

MQVP was involved in two lawsuits that are relevant to this case.  In the first, known as the "Arkansas litigation" because it was filed in the Eastern District of Arkansas, Mid-State Aftermarket Body Parts filed suit against MQVP seeking a declaratory judgment that it had not infringed MQVP's trademark. MQVP counterclaimed, alleging violations of the Lanham Act, unfair business practices, tortious interference, unfair competition, and conversion.  The district court granted summary judgment in favor of Mid-State, but the Eighth Circuit reversed and remanded, finding that there were material, disputed issues of fact for trial.  *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 631–32, 634 (8th Cir. 2006.)

In the second proceeding, known as the "Michigan litigation" because it was first filed in bankruptcy court in the Eastern District of Michigan, MQVP filed suit against Keystone Automotive

Industries, claiming violations of the Lanham Act, unfair business practices, tortious interference, unfair competition, and conversion. Keystone filed various counterclaims. Although the case began in the bankruptcy court in the Eastern District of Michigan, it was later transferred to the district court. Thus, prior to the conversion of its bankruptcy case to Chapter 7, MQVP was actively litigating two federal cases. The entities against which MQVP was litigating—Keystone and Mid-State—are associated with the LKQ Corporation and are collectively referred to as "LKQ."

Although settlement negotiations in Michigan failed, the parties eventually reached a proposed agreement in the Arkansas litigation that covered both lawsuits. In relevant part, the proposed settlement provided for (1) the dismissal with prejudice of both the Arkansas and Michigan litigations; (2) the payment of $1.2 million by LKQ to the trustee; (3) the assignment of certain intellectual property of MQVP to LKQ; and (4) the withdrawal of all claims filed by LKQ against the estate.

The trustee then asked the bankruptcy court to approve the proposed settlement. Two creditors, Global Online Certifications, Inc. and William Hindelang, the former sole shareholder of the debtor (collectively, "Global Online"), objected to the settlement agreement. In a non-evidentiary hearing before the bankruptcy court, Global Online argued that the dollar amount of the settlement was too low and that the trustee had failed to meet his burden of showing that the settlement was reasonable. Global Online admitted that it had submitted no evidence in support of its objection; it maintained only that the trustee had not met his burden. It also acknowledged that, under the settlement, it would receive around $130,000. No other creditors had any objections; in fact, MQVP's largest creditor supported the settlement.

The bankruptcy court approved the settlement. The bankruptcy judge noted that the following factors influenced her decision to approve the settlement: (1) there was no evidence of collusion among the parties, as competent counsel for the plaintiff and defendants had engaged in serious litigation for several years; (2) counsel was experienced in trademark infringement litigation, the basis of both the Michigan and Arkansas suits; (3) there was sufficient time for discovery in each case, even though the plaintiffs might have wanted more; (4) going to trial in each case would have been both time-consuming and risky; (5) a $1.2 million settlement was more beneficial to the estate than the possibility of a zero dollar recovery; (6) the largest creditor supported the settlement, while the two objecting creditors were relatively small; (7) the major witness for the plaintiff was potentially uncooperative and might have weakened plaintiff's chances of recovery; and (8) the area of law was complex.

Global Online appealed to the district court the bankruptcy's court's order approving the settlement. Global Online argued that the trustee did not offer, and the bankruptcy court did not require, any evidence regarding the propriety of the proposed settlement. After a hearing, the district court upheld the decision of the bankruptcy judge.

We review "the bankruptcy court's decision directly, according no deference to the district court." *Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 837 (6th Cir. 2010) (internal quotation marks omitted). We review the bankruptcy court's findings of fact for clear error and questions of law *de novo*. *Id.* The bankruptcy court's approval of a settlement agreement is reviewed for an abuse of discretion. *Lyndon Prop. Ins. Co. v. E. Ky. Univ.*, 200 F. App'x 409, 413 (6th Cir. 2006).

## II.

At the heart of this case is whether the bankruptcy court abused its discretion by approving the settlement agreement that the trustee proposed.[1]  A trustee in bankruptcy has the authority to seek a settlement of claims available to the debtor, but any proposed settlement is subject to the approval of the bankruptcy court, which enjoys "significant discretion." *See* Fed. R. Bankr. P. 9019(a); *In re Rankin*, 438 F. App'x 420, 426 (6th Cir. 2011).  "The very purpose of such a compromise agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'" *In re Bard*, 49 F. App'x 528, 530 (6th Cir. 2002) (quoting *In re A & C Props.*, 784 F.2d 1377, 1380–81 (9th Cir. 1986)).  Indeed, "'[t]he law favors compromise and not litigation for its own sake . . . .'" *In re Fishell*, 47 F.3d 1168, 1995 WL 66622, at *2 (6th Cir. 1995) (table) (quoting *A & C Props.*, 784 F.2d at 1380–81)).

---

[1]Also before this court is LKQ's Motion to Take Judicial Notice or Supplement the Record. LKQ filed this motion in response to Global Online's assertion in its reply brief that LKQ had cited docket entries and pleadings which it had failed to designate pursuant to Federal Rule of Appellate Procedure 6(b)(2)(B)(ii).  Global Online contends that LKQ's citations to these items must be stricken.

We find it unnecessary to resolve this question because the bankruptcy court already had before it the documents—in one form or another—to which Global Online objects.  Although LKQ cites a handful of un-designated entries on the bankruptcy court docket sheet to describe this case's procedural background, those same facts are found in other docket entries that were properly designated. Further, assuming that LKQ was required to designate certain pleadings in the Michigan and Arkansas lawsuits under Rule 6(b)(2)(B)(ii) before citing them, the bankruptcy court judge had before her the entire docket sheets in both the Michigan and Arkansas district court cases—documents which Global Online *itself* designated as part of the record on appeal.  Finally, although LKQ refers to a few un-designated pleadings in the Michigan litigation when it was still in bankruptcy court, these pleadings were filed before the very same judge who conducted the hearing at issue here.

When determining whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement or merely rely upon the trustee's word that the settlement is reasonable. *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988). Rather, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Id.* The Supreme Court has set forth the general factors to be considered by the bankruptcy judge in determining whether a proposed settlement is fair and equitable:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968). In *Bard*, this court summarized how other federal courts had implemented the Supreme Court's guidance in *TMT Trailer*—and distilled four factors for bankruptcy courts to consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Bard*, 49 F. App'x at 530. Though *Bard* is an unpublished opinion, we have continued to apply its four-factor test when considering challenges to proposed settlement agreements in bankruptcy cases.

*See Lyndon Prop. Ins. Co. v. Katz*, 196 F. App'x 383, 387 (6th Cir. 2006); *see also Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988) (setting forth three-part test similar to that articulated in *Bard*).  Importantly, however, "[a] bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement.  The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision." *Fishell*, 1995 WL 66622, at *3 (quoting *In re Am. Corp.*, 841 F.2d 159, 163 (7th Cir. 1987)).  Finally, bankruptcy courts and district courts in this jurisdiction generally accord some deference to the trustee's decision to settle a claim.  *See In re Media Cent., Inc.*, 190 B.R. 316, 321 (E.D. Tenn. 1994) (citing *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988)); *In re Smithey*, No. 10-30310, 2011 WL 3102308, at *6–7 (Bankr. N.D. Ohio, July 25, 2011); *In re Engman*, 331 B.R. 277, 298–99 (Bankr. W.D. Mich. 2005); *In re West Pointe Props. L.P.*, 249 B.R. 273, 281 (Bankr. E.D. Tenn. 2000).

## A.

The first two *Bard* factors—the probability of success in the litigation and the difficulties in the manner of collection—are related and can be analyzed together.  In this inquiry, we attempt "to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled" in order to determine whether the bankruptcy court abused its discretion.  *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 239 (S.D. Ohio 2008) (internal quotation marks omitted).  However, we "need not make a precise determination of the outcome . . . since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim." *Id.* (internal quotation marks omitted).  We consider both the stated reasons of the bankruptcy court

judge as well as additional facts in the record that could have supported her decision. *See Fishell*, 1995 WL 66622, at *3; *In re Haven, Inc.*, 326 B.R. 901, 2005 WL 927666, at *4 (6th Cir. BAP 2005) (table).

Regarding the first two *Bard* factors, the bankruptcy judge noted that: (1) there was a risk that there would be no recovery at all; (2) competent counsel had litigated the case and had "a sense of the value of the case and the time value of money;" and (3) a key witness for the plaintiff might not have been cooperative. And, although not specifically discussed by the bankruptcy judge, the following evidence was also before her: (1) an order from the Arkansas litigation, indicating that many documents that were key to the plaintiff's case had been lost or destroyed; (2) unsworn statements by the trustee that jury verdicts in similar cases averaged between $40,000 and $50,000 in Arkansas, and between $80,000 and $90,000 in Michigan; and (3) an indication by the trustee's counsel that, even if MQVP were successful in either litigation, it was likely that there would be an appeal—which the estate could not afford to litigate. All of these considerations, which inform the general inquiry into the probability of success and the difficulties of collecting judgments in the two litigations, appear to weigh in favor of the bankruptcy court's approval of the settlement. Nonetheless, Global Online makes several arguments why these considerations are insufficient to render the settlement reasonable.

First, Global Online cites *In re Cohara* in support of its argument that it was impermissible for the bankruptcy court to rely upon the trustee's unsworn statement that $1.2 million was significantly higher than the average jury verdict in Michigan and Arkansas for similar cases. *In re Cohara*, 324 B.R. 24, 28 (6th Cir. BAP 2005) ("Assertions by counsel do not constitute probative

evidence.") (internal quotation marks omitted).  Yet decisions of bankruptcy appellate panels do not bind this court.  *Phar-Mor, Inc. v. McKesson Corp.*, 534 F.3d 502, 507 (6th Cir. 2008).  Moreover, in *Cohara*, the bankruptcy appellate panel was particularly loath to rely on the debtor's unsworn statements because that was the *only* evidence she submitted in support of her argument that she should be allowed to voluntarily dismiss her Chapter 7 case.  324 B.R. at 28.  That is not the case here: the lengthy and complex litigation history and the approval of the largest creditor provided additional evidence upon which the bankruptcy court could rely.  *See* Parts B–C, *infra*.  Further, the debtor made the unsworn statements in *Cohara*, whereas here the trustee made the statements in question.  A trustee, unlike debtors or creditors, owes "fiduciary obligations to the estate and its myriad interests," *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 440 (6th Cir. 2004), and his decision to settle a claim is accorded some measure of deference.  *In re Media Cent., Inc.*, 190 B.R. at 321.  Finally, there is little concern that the bankruptcy judge was unduly swayed by the trustee's statements regarding average verdicts; she openly acknowledged that the trustee's testimony was not sworn—and in so doing signaled that she was according it less weight.

Second, Global Online claims that the bankruptcy court erred by observing that the plaintiff's key witness had not been cooperative and would have weakened the chances of success in the litigations.  The bankruptcy judge made this observation on the basis of an affidavit submitted by the trustee that indicated that, based on several email communications, the witness was not being cooperative.  Unlike the trustee's testimony about average verdicts, this statement was presented in the form of a sworn affidavit.  And although Global Online is correct that it was not given a chance to cross-examine the trustee regarding this statement, Global Online was not automatically entitled

to an evidentiary hearing on this issue. *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994); *cf. In re Century Offshore Mgmt. Corp.*, 119 F.3d 409, 412 (6th Cir. 1997) (holding that bankruptcy court was not required to conduct evidentiary hearing before granting summary judgment). In any event, the bankruptcy judge herself downplayed the significance of this fact, recognizing that Global Online objected to the assertions made in the affidavit. She stated the following:

> There is some concern, although that was rejected by the objecting creditor, that the . . . major witness here is at odds to some extent with the trustee in this case and was not necessarily going to be an easy witness for the plaintiffs . . . to have to work with. *It was certainly a concern, although primarily what the Court is looking at is the risks of litigation . . . in a case where the law is very complex and the time already spent in this case is enormous.*

(emphasis added). It appears that the bankruptcy judge considered this piece of evidence but did not rely upon it heavily, much as she did in the case of the trustee's statements regarding average verdicts. To do so was to use—not abuse—her discretion.

Finally, and perhaps most persuasively, Global Online asserts that the bankruptcy court failed to analyze the probabilities of winning at trial and how much could be won, instead merely noting that there was a risk that recovery could be zero. It is true that the risk of a zero recovery exists in every lawsuit, and it might have been preferable for the trustee to have compared the rough probability of a zero recovery with the probability of success and the potential range of recoveries at trial and to have presented this data to the bankruptcy court. However, the trustee's failure to quantify the probabilities of success is not fatal.

In *Bard*, the trustee presented no expert testimony on the value of the debtor's lawsuit, while the debtor offered expert testimony that placed the probability of success at 75% and estimated damages of up to $4 million, with a lowest reasonable settlement offer of $750,000. *Bard*, 49 F. App'x at 531. Despite this expert testimony, we affirmed a settlement agreement that netted just $92,500 because other evidence suggested that the lawsuit was somewhat weak and that "any recovery at all for the Bards was far from a certainty." *Id.* at 529, 532–33. Here, Global Online did not articulate its objections to the proposed settlement in *any* detail or attach exhibits or affidavits, and so is in a comparably weaker position than the debtor in *Bard*, who introduced expert testimony valuing likely jury awards and reasonable settlement offers. Admittedly, there were factors in *Bard*, absent here, that severely undermined the prospects of a successful litigation outcome. *See id.* at 532. Nonetheless, the bankruptcy court in this case did have before it evidence of problems that dampened the ultimate chances of litigation success: discovery problems due to numerous missing documents, a potentially uncooperative key witness, and an inability to fund an appeal. Moreover, adversarial and competent parties, acting at arm's length, arrived at the $1.2 million settlement figure after rather intense negotiations and years of litigation—a fact not easily disregarded.

It may have been preferable for the trustee to have attempted to calculate the probabilities of success and the range of recoveries more concretely and to have presented this evidence in an affidavit. *See, e.g.*, *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 428–29 (7th Cir. 2007) (setting forth range of litigation outcomes). But Global Online has not cited, and research has not revealed, a single case in which the bankruptcy court's failure to demand or rely upon a numerical calculation of the odds of success and potential gains of litigation constituted an abuse of discretion.

Accordingly, the first two *Bard* factors weigh in favor of the bankruptcy judge's approval of the settlement.

**B.**

The third *Bard* factor—the "complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"—strongly supports the bankruptcy court's ruling. *See Bard*, 49 F. App'x at 530. On this point, the bankruptcy court noted that the parties had been locked in serious litigation for seven years in Arkansas and for three years in Michigan. She also observed that "the law is very complex and the time already spent in this case is enormous." The bankruptcy judge had a solid basis upon which to make this assessment: MQVP first filed the Michigan trademark infringement complaint in her own court. She also had before her the extensive docket sheets in both cases. Moreover, the trustee's counsel noted that the case presented legal complexities, stating that "[t]he product that MQVP had was very specific and very unique, and finding case law, finding the exact situation to—or the exact discovery to prove to the Court the case was not a simple task." The mere fact that the Arkansas litigation had already been to the Eighth Circuit—resulting in remand to hold a trial—further demonstrated the complexity of the case. Indeed, the Eighth Circuit found that "[t]he many uncertain and outright disputed issues of material fact . . . permeate the chaotic record in this case . . . ." *Mid-State*, 466 F.3d at 634. Global Online appears to admit so much in its brief, but it contends that "[t]he fact that a case is very fact intensive does not mean that the case is complex." Yet as this court's own bankruptcy jurisprudence recognizes, "[t]he fact-intensive nature of [a] dispute also means that any litigation would be time-

consuming and expensive." *Fishell*, 1995 WL 66622, at *4. And this case has already been both expensive and time-consuming, dragging on ten years if the two lawsuits are combined.

## C.

The fourth *Bard* factor, which considers "the paramount interest of the creditors and a proper deference to their reasonable views," also strongly supports the bankruptcy court's decision. *Bard*, 49 F. App'x at 530. As the bankruptcy judge recognized, the largest creditor, Results Systems Corporation ("Results"), supported the settlement. Results stood to lose the most by settling if the litigation was in fact worth more than $1.2 million; thus, its views were properly given substantial weight. Results stated that it had already spent "hundreds and hundreds of thousands of dollars to litigate in four different courts" to recover on its claim and that as a result, "we'd really like to get paid. We've waited long enough. . . . We don't want to take the risk of a zero at trial. We can't afford a zero at trial." Results had indeed already waited nearly ten years to be paid—a long period of time in bankruptcy cases by this court's own measure. *See Bard*, 49 F. App'x at 533 (finding noteworthy the fact that creditor had already waited five years for payment). Finally, the bankruptcy court noted that the two objecting creditors were only a "minority . . . of the creditor pool." The near unanimity among creditors here, including the largest one, weighs in favor of approval of the settlement. *See In re Bell & Beckwith*, 87 B.R. 476, 480–81 (N.D. Ohio 1988) (affirming bankruptcy judge's approval of settlement in part on grounds that only one creditor had objected to the settlement, while the rest of the creditors, including the largest, had no objections); *see also Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("While the desires of the creditors are not

binding, a court should carefully consider the wishes of the majority of the creditors.") (internal quotation marks omitted).

**III.**

Upon analyzing the *Bard* factors, we find that the bankruptcy judge did not abuse her discretion in approving the settlement and therefore affirm the decision of the district court.