RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0356p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

IN RE: TAJ GRAPHICS ENTERPRISES, L.L.C.,

*Debtor.*

─────────────────────────────────────

PRIME FINANCIAL, INC.,

*Appellant,*

*v.*

MARK H. SHAPIRO, Trustee; INTERNAL REVENUE
SERVICE; ROBERT KATTULA,

*Appellees.*

No. 24-1919

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-13010—Robert Jerome White, District Judge.

─────────────

United States Bankruptcy Court for the Eastern District of Michigan at Detroit.
No. 2:09-bk-72532—Thomas J. Tucker, Bankruptcy Judge.

Argued: October 21, 2025

Decided and Filed: December 22, 2025

Before: MOORE, CLAY, and WHITE, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Jay S. Kalish, LAW OFFICE OF JAY S. KALISH, P.C., Farmington Hills, Michigan, for Appellant. Robert N. Bassel, Clinton, Michigan, for Appellees Robert Kattula and Bankruptcy Trustee. Matthew S. Johnshoy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee Internal Revenue Service. **ON BRIEF:** Jay S. Kalish, LAW OFFICE OF JAY S. KALISH, P.C., Farmington Hills, Michigan, for Appellant. Robert N. Bassel, Clinton, Michigan, for Appellee Robert Kattula. Tracy M. Clark, STEINBERG SHAPIRO & CLARK, Southfield, Michigan for Appellee Bankruptcy Trustee. Matthew S.

Johnshoy, Bruce R. Ellisen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee Internal Revenue Service.

—————————

**OPINION**

—————————

HELENE N. WHITE, Circuit Judge.   Appellant Prime Financial seeks reversal of the bankruptcy court's approval of a settlement agreement between the trustee of debtor TAJ Graphics Enterprises, LLC's, bankruptcy estate, debtor's owner Robert Kattula, and certain parties related to Kattula.   Prime Financial argues that the bankruptcy and district courts applied an incorrect standard for evaluating a Chapter 7 bankruptcy settlement and improperly valued certain assets it contends belong in the bankruptcy estate.   Prime Financial also raises several procedural concerns.   We AFFIRM.

## I.  Factual Background

TAJ Graphics Enterprises, LLC ("TAJ"), the debtor, is a Michigan limited liability company formed in 1998.  *In re Taj Graphics Enters., LLC*, 601 B.R. 451, 456 (Bankr. E.D. Mich. 2019).   Robert Kattula controls and manages TAJ.   Prime Financial, Inc. ("Prime Financial"), an unsecured creditor, is a Michigan corporation owned and operated by Aaron Jade that is "in the business of sub-prime lending."   Appellant's Br. at 8.   Prior to 2003, Prime Financial made two loans to K&B Capital, LLC ("K&B), another entity owned by Kattula, one totaling $1,425,000, and the second totaling $1,250,000.   TAJ guaranteed both loans.   TAJ originally filed for bankruptcy in 2003.   In that case, TAJ proposed and the bankruptcy court confirmed in 2004 a Chapter 11 plan requiring that Prime Financial be paid $1,200,000 plus interest by October 12, 2009.   The bankruptcy court closed the first case in 2007, in an order setting forth the terms of the plan agreed to by the parties.

In 2009, TAJ again filed a Chapter 11 bankruptcy petition, marking the beginning of the instant case.   The bankruptcy court converted the case to a Chapter 7 bankruptcy in 2019.   Prime Financial filed a proof of claim contending that it was not paid pursuant to the 2004 plan.   TAJ disputed the claim, pointing to payments made by K&B and TAJ to Prime Financial in October

of 2004.  The bankruptcy court issued an order and opinion on April 19, 2019, determining that the payment made by K&B to Prime Financial constituted a payment on its own debt, not on the $1,200,000 owed by TAJ to Prime Financial.  601 B.R. at 485.  The bankruptcy court additionally determined that TAJ's own payment to Prime Financial reduced its debt to $731,339.91.  *Id.* at 488.  Factoring in the interest rate, the bankruptcy court determined that Prime Financial's total remaining claim against TAJ was $1,356,044.45.  *Id.* at 489.

The TAJ bankruptcy estate holds five disputed assets: (1) rights assigned to TAJ by K&B under a 2004 assignment; (2) rights assigned to TAJ by Kattula under a 2006 assignment; (3) claims made in a lawsuit pending in Kentucky, Marshall Circuit Court, Case No. 22-CI-00020, *K&B and Kattula v. Aaron Jade, et al.*; (4) an "Unconditional Guarantee of Payment" and other documents executed in favor of K&B and assertedly assigned to TAJ; and (5) a $1,500,000 debt owed by Kattula and his wife to TAJ, secured by a mortgage on their home.  R. 3, Page ID 501.

The 2006 assignment purports to assign to TAJ Kattula's rights under a Memorandum of Understanding ("MOU") between Kattula and Calvert Properties, another entity owned by Aaron Jade, governing the joint operation and distribution of profits of a Kentucky landfill.  Kattula disputes the validity of the assignment and claims to own his original interest in the MOU.  Prime Financial vigorously disputes that claim, and points to TAJ's monthly financial statements, signed by Kattula, which list the MOU as an asset of TAJ.  Appellant's Br. at 12, 40-41.  Earlier in this litigation, the bankruptcy court held the 2004 assignment ineffective, finding that TAJ had no legal authority to enter into the transaction given the ongoing bankruptcy proceedings, and also finding that the document was signed on a different date than the date given and not signed by either TAJ or K&B, that the signatures did not clearly bind the parties, and that the assignment document itself did not actually assign any assets to TAJ.  *In re TAJ Graphics*, 601 B.R. at 469-85.  The bankruptcy court also held that language in the 2004 assignment "did not transfer ownership of the claims to the Debtor."  *Id.* at 481.  This finding was made over the objections of Kattula, who at that stage of the litigation argued that the assignment was effective and demonstrated that the payments by K&B to Prime Financial were, in fact, payments from TAJ.  *Id.*  at 470.  The validity of the 2006 assignment has not been determined by any court.

On July 12, 2022, the Chapter 7 trustee filed a motion for approval of a settlement. Under the terms of the settlement, Kattula agreed to waive certain claims against the bankruptcy estate and pay $50,000 into the estate. Kattula would then take ownership of the estate's interest in the five disputed assets.

Prime Financial filed objections to the proposed settlement. Prime Financial argued that Kattula's previous assertions that he transferred his interest in the MOU to TAJ rendered him judicially estopped from claiming that the ownership of that interest is uncertain. Prime Financial also objected that the trustee mischaracterized Prime Financial's own offer to purchase the estate's interest in the MOU and other assets for $100,000, twice what Kattula would pay under the settlement, as an offer with "strict contingencies." R. 3, Page ID 238. Finally, Prime Financial argued that the trustee had failed to investigate or administer the estate's assets or potential assets, in dereliction of his duty.

The United States, on behalf of the Internal Revenue Service ("IRS"), filed a motion in support of the proposed settlement. The IRS is the senior secured creditor of the bankruptcy estate, having filed a proof of claim against TAJ, as an alter ego, for Kattula's tax debts. In its motion, the United States explained that it had agreed to a settlement with Kattula, in which it would reduce the amount of his tax liability and amend its claims in the bankruptcy litigation to allow the trustee to pay administrative expenses and unsecured creditors (though the United States acknowledged that the administrative expenses would likely exhaust Kattula's payment to the estate). In exchange, Kattula agreed to use his assets to pay the IRS's tax claims outside of the bankruptcy proceedings, secured by interests in Kattula's residence and in Kattula's interest in litigation brought by him against Prime Financial. In answer to Prime Financial's objections, the United States argued that there is no reason to believe the bankruptcy estate contains sufficient value to pay off the IRS's claims and still have money to pay anything to an unsecured creditor like Prime Financial. The United States pointed out that any attempt to liquidate assets in the estate would require substantial litigation to determine proper ownership, requiring resources that the estate lacks. The United States also pointed out that Prime Financial's offer to purchase assets in the estate was "illusory" because the offer was contingent on a guarantee of quiet title that the Trustee was unable to give. R. 3, Page ID 284. Further, the United States

stated that it would object to any sale of the assets that did not enable the IRS to collect the taxes owed by Kattula. And because Prime Financial's offer to purchase the estate's assets did not come with an agreement that Kattula would make payments on his debt to the IRS, secured by his own assets, the United States argued that Prime Financial's offer would have placed the secured creditor in a worse position than the alternative supported by the trustee.

The bankruptcy court issued an opinion and order approving the settlement, concluding that, "under the circumstances[,] . . . the compromise proposed in the Trustee Motion is fair and equitable; is reasonable; is in the best interests of the bankruptcy estate and its creditors; and should be approved." R. 3, Page ID 501. The bankruptcy court gave six reasons for its decision.

The court first concluded that the estate lacked money to hire counsel to conduct the litigation that would be necessary to liquidate assets in the estate. Second, it rejected the possibility of Prime Financial's litigating the estate's interest in "potential estate assets." R. 3, Page ID 503. The bankruptcy court determined that the offer was unworkable both because Prime Financial expressed only a willingness to litigate ownership, not to liquidate the estate's assets, and because of the conflict of interest that the bankruptcy court believed would arise from Prime Financial's litigating the estate's interest in an MOU against a company owned by Prime Financial's owner.

Third, the court recognized that the estate's ownership of assets, including the MOU, was disputed by Kattula. Prime Financial considers the MOU the estate's most valuable asset. Although the court found "serious problems . . . with Kattula's credibility," it nonetheless found that he might prevail if the matter were litigated. *Id.* at 504. The court rejected Prime Financial's argument that Kattula was judicially estopped from claiming to own the MOU, pointing out that no court had adopted Kattula's prior position that he assigned his rights under the MOU to TAJ.

Fourth, the court pointed to the IRS's support of the compromise, a fact carrying significant weight given the IRS's secured claim in the amount of $436,154.68. The court explained that, absent the IRS's waiving its secured claim, "the estate would have to realize a net amount *substantially more than* $436,154.68 in proceeds from the Assets before any nonpriority

unsecured creditor, such as Prime Financial, could receive any distribution at all." *Id.* at 505-06. The court considered that unlikely and concluded that Prime Financial was therefore unlikely to be prejudiced by the settlement.

Fifth, the court found that the value of the assets that could actually be realized from the bankruptcy estate was speculative, particularly given the dispute over ownership. The court pointed out that Prime Financial had not provided evidence to support its assertion about the possible value of the rights under the MOU. And finally, sixth, the court noted that the settlement would spare the estate the expense and time of litigating the case further.

Prime Financial filed a timely notice of appeal to the district court, which affirmed the bankruptcy court's decision. This appeal followed.

## II.  Legal Background

When a debtor "file[s] for bankruptcy, [its] property generally becomes property of the (newly[]created) bankruptcy estate." *Church Joint Venture, L.P., ex rel. Chapter 7 Tr. v. Blasingame (In re Blasingame)*, 920 F.3d 384, 388 (6th Cir. 2019); 11 U.S.C. § 541(a). In a Chapter 7 bankruptcy, a trustee is appointed who is "charged with selling the property in the estate . . . and distributing the proceeds to the debtor's creditors." *Harris v. Viegelahn*, 575 U.S. 510, 513 (2015) (citing 11 U.S.C. §§ 704(a)(1), 726). "The bankruptcy trustee's goal is to maximize the value of the estate and, in turn, to maximize the amount the creditors will get paid." *Blasingame*, 920 F.3d at 388 (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) and 11 U.S.C. § 704(a)(1)).

The Bankruptcy Code "sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate. Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017). Administrative-expense creditors and priority claims are next in priority. *See* 11 U.S.C. §§ 503, 507, 726. After secured, administrative, and priority claims are paid, the estate pays the remaining assets to general unsecured creditors. *Id.*

A Chapter 7 trustee has authority to seek a settlement, subject to the approval of the bankruptcy court. Fed. R. Bankr. P. 9019(a). We review the decision of a bankruptcy court "directly, according no deference to the district court." *Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 837 (6th Cir. 2010) (quoting *Phar–Mor, Inc. v. McKesson Corp.*, 534 F.3d 502, 504 (6th Cir. 2008)). "The bankruptcy court's findings of fact are reviewed for clear error, and questions of law are reviewed de novo." *Id.* (quoting *Phar–Mor, Inc.*, 534 F.3d at 504).

## III. Discussion

### A. Merits of Settlement

In assessing the merits of the settlement, Prime Financial and the United States both point us to the standard set out in *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2002), the same standard relied on by the district court. Kattula and the trustee do not offer a contrary test. Although there is a dearth of published Sixth Circuit case law on point, unpublished cases support reliance on *Bard*.[1] *See, e.g.*, *Bush v. Nathan (In re Bush)*, No. 19-2131, 2021 WL 1327226, at *2 (6th Cir. Jan. 12, 2021); *Hindelang v. Mid–State Aftermarket Body Parts Inc. (In re MQVP, Inc.)*, 477 F. App'x 310, 313 (6th Cir. 2012).

*Bard* sets out a four-part test for evaluating a bankruptcy court's approval of a settlement. Under *Bard*, we consider, "(a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Bard*, 49 F. App'x at 530 (collecting cases).

---

[1]Prime Financial argues that the bankruptcy court failed to evaluate the proposed settlement under the proper framework. This argument focuses on the bankruptcy court's underlying decision, discussed below. To the extent Prime Financial objects to the bankruptcy court's failure to cite the factors set out in *Bard*, we note that the bankruptcy court did, in fact, thoroughly and properly address each factor, such that we cannot say its approval of the settlement was an abuse of discretion. Prime Financial further argues that the district court applied an incorrect framework. Because we review the decision of a bankruptcy court directly, we need not consider the district court's ruling, *Nat'l Union Fire Ins. Co.*, 606 F.3d at 837, though we do note that the district court correctly applied *Bard*, *see In re Taj Graphics Enters., LLC*, No. 22-cv-13010, 2024 WL 4349177, *5-6 (E.D. Mich. Sep. 30, 2024).

In evaluating the settlement, courts "generally accord some deference to the trustee's decision to settle a claim." *MQVP,* 477 F. App'x at 313 (citing *Johnson v. Jackson Television, Inc.. (In re Media Cent., Inc.)*, 190 B.R. 316, 321 (E.D. Tenn. 1994)). Further, the bankruptcy court enjoys "significant discretion" in determining "whether to approve a proposed settlement." *Id.* at 312-13 (quoting *Rankin v. Lavan and Assoc., P.C. (In re Rankin)*, 438 F. App'x 420, 426 (6th Cir. 2011)). That said, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Id.* at 313 (quoting *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988)).

In analyzing the first two factors—probability of success in the litigation and difficulties with collection—we "attempt 'to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled' in order to determine whether the bankruptcy court abused its discretion." *Id.* at 313-14 (quoting *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 239 (Bankr. S.D. Ohio 2008)). Notably, however, "[a] bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement." *Id.* at 313 (alteration in original) (quoting *Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168, 1168 (6th Cir. 1995) (table)).

Here, the bankruptcy court reasonably determined that the trustee's ability to establish ownership rights in the claims at issue, and in particular, ownership of the MOU, was uncertain, diminishing the value of litigating as opposed to settling. The bankruptcy court found that Kattula had "a chance to succeed in his current assertion that he did not assign away ownership of his rights under the MOU . . . despite the serious problems [the bankruptcy court] found with Kattula's credibility." R. 3, Page ID 504. If Kattula were to successfully assert his claim of ownership, the estate would be deprived of any value from the MOU.

Prime Financial objects to this reasoning, arguing that Kattula's lack of credibility undermined his position that he maintained any interest in the MOU. Prime Financial points to the numerous Schedules and Statements of Financial Affairs filed by TAJ in these proceedings and signed by Kattula stating that TAJ owned Kattula's original interest in the MOU.

The bankruptcy court acknowledged that Kattula long claimed to have assigned his rights under the MOU to TAJ and had questionable credibility, but nonetheless determined that his claim of ownership had a chance of success. The bankruptcy court had previously determined that the 2004 assignment was ineffective in part because "the Debtor had no legal authority to enter into the transaction" given the pending bankruptcy proceedings and that the language in the assignment did not show an intent to transfer ownership. *In re TAJ Graphics*, 601 B.R. at 478. In approving the settlement, the bankruptcy court noted that "at least one of the reasons for the Court's conclusion on [the validity of the 2004 assignment] may also apply to the Assignment dated June 1, 2006." R. 3, Page ID 504. Presumably, the court was referring to its conclusion that TAJ was not authorized to enter into transactions of this type given the ongoing bankruptcy proceedings or to the conclusion that the language of the 2004 assignment, which is identical in relevant respects to the 2006 assignment, did not transfer ownership of the assets. R. 3, Page ID 209, 211. In light of these facts, it was reasonable for the bankruptcy court to question the validity of the 2006 assignment.[2]

More importantly, Prime Financial does not point to facts in the record ignored by the bankruptcy court that might persuade us that the value of litigation significantly exceeded the settlement agreement, either related to the ownership issue or the underlying value of the assets. The bankruptcy court was not required to hold a "mini-trial." *Fishell,* 47 F.3d at 1168 (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)). Indeed, the Supreme Court described the bankruptcy court's obligation under the then-controlling Bankruptcy Act as to "form an educated estimate" of the issues. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). With the limited resources and information available, it was reasonable for the bankruptcy court to conclude that the uncertainty of the estate's success in litigation greatly diminished the potential value of the estate's assets. *See MQVP*, 477 F. App'x at 314 ("[A]n exact judicial determination of the values in issue would defeat the purpose of compromising the claim.") (quoting *Nicole Energy*, 385 B.R. at 239).

---

[2]Notably, while Kattula changed his position to claim that he, not TAJ, owns the interest in the MOU, that change took place after the bankruptcy court determined that the 2004 assignment was ineffective.

In addressing anticipated difficulties in collection, the bankruptcy court pointed out that the trustee lacked the funds necessary to litigate ownership of the disputed assets, including the MOU and the assets purportedly assigned from K&B, and to monetize any ownership interests. Prime Financial objects to this justification, arguing that the trustee's duty to maximize the assets of the estate is not contingent on having funds. But absent funds for litigation, it would be impracticable for the bankruptcy estate to assert its ownership interest in the disputed assets. Prime Financial does not offer evidence that the trustee was misrepresenting the estate's financial condition. It was therefore proper for the trustee, and the reviewing bankruptcy court, to consider the difficulties that would likely result from any attempt to collect funds. Further, the bankruptcy court noted that, even if ownership of the estate's assets was determined, monetization was "likely to be complex, very expensive and very time consuming." R. 3, Page ID 507. In light of the uncertainty surrounding the ownership and value of the estate's assets and the contentious nature of the case, the bankruptcy court reasonably determined that collecting on the estate's assets would be difficult and time-consuming.

At the hearing on the trustee's motion to approve the settlement agreement, Prime Financial tentatively contemplated the option of litigating ownership of the disputed assets itself under a contingency fee arrangement on a theory of derivative standing. Post-hearing, Prime Financial formally stated its willingness to act on behalf of the bankruptcy estate "for the purpose of establishing the bankruptcy estate's title and interest in potential estate assets." R. 3, Page ID 495. Prime Financial stated at the hearing that, if it established title to the assets, "it would be up to the Trustee" to pursue liquidation of that interest. Bankr. Case No. 09-72532, R. 1263 at 35. The bankruptcy court concluded that this proposed arrangement would not be feasible. First, the bankruptcy court noted that Prime Financial did not offer to litigate liquidation of the estate's assets, another likely expensive endeavor for which the trustee lacked funds. Thus, even if Prime Financial successfully litigated the estate's ownership of the disputed assets, liquidation of those interests would necessitate further litigation requiring resources the estate lacked. The bankruptcy court also noted that litigation on a contingency basis was improbable because of "the nature of the claims and disputes involved." R. 3, Page ID 502. Second, the bankruptcy court concluded that such an arrangement would likely be unworkable

because it would place Prime Financial's lawyers in the untenable position of representing the estate's interest in the MOU against Calvert Properties, another entity owned by Aaron Jade. The bankruptcy court concluded that such an arrangement likely would not be permitted, and thus Prime Financial's offer did not change the analysis under factor two. But Prime Financial's attorneys likely could litigate the estate's interest in the MOU, since the ownership of that interest is not directly opposed to Calvert Properties. Rather, the estate's interest in the MOU is directly opposed to Kattula's claimed interest. Even so, because Prime Financial did not agree to litigate liquidation of the estate, and did not provide evidence that the MOU's value was significant or would entice an attorney to work on a contingency basis, the bankruptcy court was still correct in concluding that the offer did not change the calculus significantly. The trustee still would lack the resources to monetize the estate's assets.

The third factor asks us to consider the complexity and expense of litigation. Neither party disputes the complexity and expense involved in this litigation. To the contrary, Prime Financial describes the case as "a voluminous case with a 15-year history of contentious litigation." Reply Br. at 9. To litigate the matter further would obligate the estate to take on more expenses, which the bankruptcy court recognized would prove problematic given the lack of funds to hire counsel and the difficulty of finding counsel to proceed on a contingency basis. The bankruptcy court reasonably reviewed the situation facing the trustee and concluded that settlement was preferrable to yet more costly and lengthy litigation.

The final factor asks us to consider the interests and reasonable views of the creditors. The bankruptcy court properly focused on the fact that the IRS, TAJ's main secured creditor, supported the settlement agreement. The settlement agreement allowed the IRS to collect a significant portion of what it was owed, albeit outside the liquidation of the bankruptcy estate. Further, the bankruptcy court reasonably concluded that the alternative, rejecting the proposed settlement, was unlikely to provide a payout to Prime Financial. As the bankruptcy court explained,

> [E]ven if the bankruptcy estate could obtain counsel to litigate for it, and even if such counsel were successful in litigating the estate's ownership of the Assets, including the rights under the MOU, the estate would have to realize a net amount *substantially more than* $436,154.68 in proceeds from the Assets before any

nonpriority unsecured creditor, such as Prime Financial, could receive any
distribution at all.

R. 3, Page ID 505-06.  There is no evidence that the value of the estate's assets exceeds the IRS's undisputed and secured claim.  Indeed, the only valuation evidence produced by Prime Financial is its offer to purchase the estate's interest in the MOU and some of the other disputed assets for $100,000, far less than the IRS's secured claim.  Accordingly, the bankruptcy court reasonably concluded that the settlement did not interfere with Prime Financial's interests.

Each of the *Bard* factors supports the bankruptcy court's decision to approve the settlement agreement.  The purpose of a compromise agreement "is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims."  *MQVP*, 477 F. App'x at 312 (quoting *Bard*, 49 F. App'x at 530); *see also Fishell*, 47 F.3d at 1168 ("The law favors compromise and not litigation for its own sake." (quoting *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986))).  The bankruptcy court determined that the trustee's proposed settlement maximized the value to the creditors given the limited resources and information available.  We have no basis to conclude that the bankruptcy court abused its discretion in approving the settlement.  *See B-Line, LLC v. Wingerter (In re Wingerter)*, 594 F.3d 931, 936 (6th Cir. 2010) ("The question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." (quoting *Barlow v. M.J. Waterman & Assocs., Inc. (In re M.J. Waterman & Assocs., Inc.)*, 227 F.3d 604, 608 (6th Cir. 2000))).

## B.  Remaining Objections

Beyond the merits of the settlement agreement, Prime Financial raises five objections, none of which persuades us that the bankruptcy court abused its discretion.

### 1.    Competing offer to purchase assets

First, Prime Financial objects that the bankruptcy court failed to adequately consider its $100,000 offer to purchase the estate's assets that Kattula purchased for $50,000 in the settlement.  But this offer was illusory.  Prime Financial offered to buy the assets only if the

trustee could warrant the estate's title to the assets, but the estate did not possess undisputed title to these assets. Prime Financial acknowledges that it withdrew its offer because the estate could not warrant title to the assets but argues that "the offer was withdrawn for a reason having nothing to do with its' [sic] value." Reply Br. at 11. Prime Financial appears to argue that the value of the asset to the estate should not depend on whether or not its title is contested. But an asset with clean title is clearly more valuable than an asset of contested ownership, as evidenced by Prime Financial's willingness to spend $100,000 for the former and nothing for the latter. And an offer to buy an asset with clean title for $100,000 tells the bankruptcy court little about the value of the asset without that clean title.

Perhaps more important, selling the estate's assets to Prime Financial would not have allowed the IRS to recover the full amount of its secured interest. Prime Financial does not dispute the IRS's claim against the estate totaling $436,154.68. The settlement agreement allowed the IRS to collect on Kattula's federal tax debts, albeit outside of the bankruptcy litigation, and to secure that agreement by tax liens attached to the residence titled to Kattula's wife. The IRS thus stated that it would have objected to a sale to Prime Financial that did not offer the same security. Accordingly, it was not error to reject Prime Financial's offer as not serving the interest of the main creditor.

2.        Failure to determine asset value

Prime Financial next objects to the trustee's failure to determine, investigate, and verify the value of the estate's assets. But without funds to litigate ownership or liquidation of the disputed assets, it is unclear how the trustee would have done so. As discussed, it was reasonable for the trustee, and the bankruptcy court, to conclude that the ownership and value of the estate's assets was unclear. Prime Financial argues that the value of the estate's MOU rights could be significant, but it offers no valuation, nor any basis for its belief in the value.[3] The bankruptcy court concluded that "Prime Financial has not presented or proffered any evidence, or any specific reason(s), to support its counsel's vague speculation about the possible value of

---

[3]When the trustee sought information from Calvert Properties, which is controlled by Aaron Jade, who also controls Prime Financial, Calvert refused to provide the information. R. 3, Page ID 194-96, 226-28; Bankr. R. 1194; Bankr. R. 1195.

the MOU rights." R. 3, Page ID 506. The reality is that the parties, the trustee, and the bankruptcy court all operated with incomplete evidence and without the resources necessary to definitively determine the proper ownership and value of the disputed assets. The very purpose of a settlement like this is to spare the parties and the estate the time and expense of further litigation, even when uncertainty exists. That option is yet more attractive when the estate lacks the resources to participate in hypothetical future litigation.

3.      Deceitful conduct and impropriety

Prime Financial next levies conclusory accusations of bad faith at Kattula, the trustee, and the IRS. None of these accusations convinces us that impropriety marred the negotiated settlement. Prime Financial recites a litany of complaints against Kattula for "fraudulent character and illicit history." Reply Br. at 16. It cites prior cases in which Kattula was found in contempt and argues that he has perjured himself. It also notes that Kattula has been sued by the United States for unpaid taxes. But Prime Financial does not provide any evidence of wrongdoing in the negotiation of this settlement. Nor does it offer an argument for why Kattula's bad behavior in the past should have caused the bankruptcy court to reject the negotiated settlement. The question for the bankruptcy court was whether the settlement agreement was in the bankruptcy estate's best interest, not whether Kattula had good character.

Similarly, Prime Financial accuses the trustee of bad faith but offers no evidence of impropriety. Prime Financial questions the purported lack of resources available to the estate but does not articulate facts in support of its skepticism. Prime Financial objects to the trustee's refusal to guarantee title to the assets it wished to purchase from the estate, but it does not explain how the trustee could have provided such assurances given the ownership dispute. In short, Prime Financial's conclusory allegations of bad faith against the trustee do not convince us that the settlement was negotiated in bad faith.

Finally, Prime Financial accuses the IRS of impropriety. These allegations appear only in the reply brief and are stated in brief, conclusory fashion. Prime Financial accuses the IRS of "some degree of collusion" for agreeing to waive its claims against the estate to facilitate the sale of the MOU to Kattula. Reply Br. at 18. But the record makes clear that the IRS agreed to the

compromise in exchange for Kattula's agreement to pay a substantial portion of his tax debt, along with security for that promise. Prime Financial gives us no reason to think this negotiated compromise constituted improper "collusion."

### 4.     Oral Argument

Prime Financial argues that the district court improperly failed to set this matter for oral argument. But we review the bankruptcy court's decision directly. *Nat'l Union Fire Ins. Co.*, 606 F.3d at 837. It therefore does not matter to our review whether the district court scheduled oral argument. *Teter v. Baumgart (In Re Teter)*, 90 F.4th 493, 501 (6th Cir.) ("Oral argument or not, what happened in the district court typically does not affect our review of the bankruptcy court's order and judgment." (citing *Weinman v. Kelley (In re Kelley)*, 703 F. App'x 668, 672 (10th Cir. 2017), *cert. denied sub nom. Teter v. United States Tr.*, 144 S. Ct. 2527 (2024) (mem.))).

### 5.     Motion for Clarification

Finally, Prime Financial objects in passing to the district court's affirmance of the bankruptcy court's order denying its June 27, 2022, Motion for Clarification of Court's May 24, 2019, Order Converting Case to a Chapter 7, or in the Alternative, To Schedule an Evidentiary Hearing to Determine the Identity of Property of the Estate. Prime Financial offers no argument in support of this position. The issue is therefore forfeited. *See Harchar v. United States (In re Harchar)*, 694 F.3d 639, 643 n.3 (6th Cir. 2012).

*        *        *

For the reasons stated, we AFFIRM the district court's order affirming the bankruptcy court's settlement order. We also DENY Prime Financial's motion to stay the state-court proceeding as moot.